Danna K. BEACH, Plaintiff
and Appellant,

v.

The UNIVERSITY OF UTAH, David P.
Gardner, individually and in his official
capacity as President of the University
of Utah, Dr. Rick Davern, individually
and in his official capacity as Vice
President, Academic Affairs, University
of Utah, the Institutional Council of the
University of Utah, individually and
through its members, Joseph Bernolfo,
M.L. Brian, Reed W. Binton, Edward
W. Clyde, Richard Giauque, Mrs. James
H. Gillespi, Mrs. Stewart M. Hanson,
Jr., Paige Paulsen, D. Brent Scott, and
Fullmer H. Latter, individually and in
their official capacities, David M.
Grant, individually and in his official
capacity as Dean of the College of Sci-
ences, University of Utah, Bill Baker,
individually and in his official capacity
as Chairman, Biology Department, Uni-
versity of Utah, Ed Ridges, individually
and in his official capacity as Business
Manager, Biology Department, Univer-
sity of Utah, Orlando Cuellar, individu-
ally and in his capacity as a biology
professor, University of Utah, and Ron
Stewart, individually and in his official
capacity as teacher's assistant, Univer-
sity of Utah, Defendants and Respon-
dents.

No. 19389.

Supreme Court of Utah.

Sept. 26, 1986.

414

Kathryn P. Collard, Salt Lake City, Robert P. Schuster, Gary L. Shockey, Bradley L. Booke, Jackson, Wyo., for plaintiff and appellant.

Allan L. Larson, Bruce H. Hensen, Salt Lake City, for defendants and respondents.

ZIMMERMAN, Justice:

Plaintiff Danna Beach appeals from a summary judgment dismissing her claim against the University of Utah, the President of the University, the University Institutional Council, various officials of the College of Science, and a biology professor (collectively referred to as "the University") seeking damages for personal injuries sustained when she fell from a cliff at night during a field trip sponsored by the University. For the purposes of its decision only, the trial court assumed that defendants owed a special duty of care to Beach but concluded that there was no breach of that duty. We affirm on the ground that no special relationship existed between the parties requiring the University to protect Beach from the consequences of her voluntary intoxication.

■ When a case has been dismissed upon a motion for summary judgment, we consider the facts in the light most favorable to the party against whom the judgment was rendered. *See, e.g., Durham v. Margetts,* 571 P.2d 1332, 1334 (Utah 1977). The recitation of the facts in this case reflects that principle. Beach, a twenty-year-old student at the University of Utah, enrolled in a freshman-level field biology class during the spring quarter of 1979. The class, taught by a tenured professor, Orlando Cuellar, required students to attend three one-day field trips and three weekend field trips.

Before the first trip, Cuellar instructed his students that they must follow his directions during class time, but were free to pursue personal interests when the day's work was completed. Students were urged to drop the class if the field trips posed any physical or other problems for them. Beach had lived away from home for three years, and although she lacked camping experience, she enjoyed athletics and had no trouble keeping up with the physical demands of the trips.

Prior to the final outing, Beach had attended all of the field trips and experienced only one minor problem. On a field trip to Lake Powell, she fell asleep in the bushes near the camp after drinking some wine. Cuellar and several students later found her and returned her to the camp. Beach informed Cuellar that the incident was unusual.

The final trip of the quarter took place over the Memorial Day weekend in the Deep Creek mountains of Utah. Beach arrived at the campsite late Friday afternoon with Cuellar's teaching assistant. Before dinner, Cuellar took all of the students on a hike to orient them to their surroundings. The hike included the area in which Beach's fall later occurred, an area of high rocks off which Beach and several other students rappelled on Saturday.

On Sunday, the students attended a lamb roast given by a local rancher after completing their field work. Beach stated that she had one mixed drink and three or four glasses of home-brewed beer while at the lamb roast. Cuellar testified that he assumed most people at the lamb roast were drinking alcohol and that he had several beers. After the lamb roast, Beach returned to camp in a university van driven by Cuellar. While in the back of the van, Beach drank some whiskey.

Beach testified that when the van reached the campsite, she did not act inebriated or in any way impaired, but appeared to be well-oriented and alert. She had no trouble getting out of the van and headed for her tent, just across the stream from the van and one hundred twenty-five feet from the center of the camp. On the way, however, she became disoriented. When no one responded to her call for assistance, she decided to retrace her route. Beach had no memory of anything else that happened that night.

Beach's tentmate noticed her absence at six o'clock the next morning. Because Beach was usually one of the last to turn in at night, she had not been missed the previous evening. A search began, and about six hours later, she was found unconscious in a crevice near the rocky area where she had rappelled the previous day. As a result of injuries sustained in her fall, Beach is a quadriplegic with some limited use of her arms.

Beach filed a suit seeking damages from Cuellar, the University, and numerous University officials. The University moved for summary judgment alleging that it owed Beach no special duty of care. For purposes of the summary judgment, the court assumed *arguendo* that the University had a duty to exercise reasonable care to protect and supervise Beach, but concluded that there was no breach of that duty. The trial court therefore granted the University's motion and dismissed Beach's action.

On appeal, Beach asserts that a special relationship existed between the parties which gave rise to an affirmative duty on Cuellar's part to supervise and protect her. She claims that summary judgment was inappropriate because the facts were in dispute concerning whether that duty had been breached.[1]

One essential element of a negligence action is a duty of reasonable care owed to the plaintiff by defendant. *Hughes v. Housley*, 599 P.2d 1250, 1253 (Utah 1979); *Williams v. Melby*, 699 P.2d 723, 726 (Utah 1985). Absent a showing of a duty, Beach cannot recover.

Here, Beach contends that Cuellar and the University breached their affirmative duty to supervise and protect her. Ordinarily, a party does not have an affirmative duty to care for another. Absent unusual circumstances which justify imposing such an affirmative responsibility, "one has no duty to look after the safety of another who has become voluntarily intoxicated and thus limited his ability to protect himself." *Benally v. Robinson*, 14 Utah 2d 6, 9, 376 P.2d 388, 390 (1962). The law imposes upon one party an affirmative duty to act only when certain special relationships exist between the parties. These relationships generally arise when one assumes responsibility for another's safety or deprives another of his or her normal opportunities for self-protection. Restatement (Second) of Torts § 314(A) (1964).[2] The

---

1. Beach also claims that the trial court improperly determined the factual issues related to the existence of a special duty. She argues that the extent of Cuellar's knowledge about her drinking and her tendency to become disoriented was genuinely in dispute and should have been resolved by a jury. We disagree. The critical facts are established by Beach's own testimony that she did not act inebriated or impaired when she arrived at the campsite on Sunday night. Thus, even if there were a dispute as to what Cuellar knew or should have known, we conclude that if the finder of fact had believed Beach and disbelieved all contrary evidence, she could not have recovered.

2. Such a relationship may be imposed, for instance, upon a police officer who has custody over an arrested individual. *Benally v. Robinson*, 14 Utah 2d 6, 9, 376 P.2d 388, 390 (1962). *See also DCR, Inc. v. Peak Alarm Co.*, 663 P.2d 433, 435 (Utah 1983). As noted in *Peak Alarm*,

essence of a special relationship is dependence by one party upon the other or mutual dependence between the parties. *Id.* at comment (b).

To avoid summary judgment, Beach was obligated to prove that she had a special relationship with the University which obligated the University to supervise and protect her and that the duty was breached, causing her injuries. The question, then, is whether the facts in the record establish some basis for imposing an affirmative duty upon the University to protect Beach from her own intoxication and disorientation on the night in question.

At oral argument, counsel for Beach conceded that the mere relationship of student to teacher was not enough to give rise to such a duty. In fact, Beach's counsel conceded that Cuellar had no duty to walk each student to his or her tent or sleeping bag on the night of the accident, a measure that presumably would have prevented the accident. Therefore, to prevail on the special duty issue, Beach must distinguish her circumstances from those of the other students on the field trip.

The primary thrust of Beach's claim before this Court, as demonstrated by her counsel's concessions at oral argument, is that based upon the incident during the earlier field trip to Lake Powell, Cuellar knew or should have known of her propensity to become disoriented after drinking. Because of this knowledge, Beach maintains that the University had a special duty to supervise her on the evening in question. We do not agree that any special duty arose by reason of Cuellar's knowledge.

The Lake Powell incident, which Beach relies upon heavily, is not determinative of whether a special relationship arose. Beach testified that at Lake Powell, she became dizzy when she reached the bushes after leaving the rest of the company. Therefore, there was nothing about her demeanor during the time she was within Cuellar's sight that would have alerted Cuellar or other participants in the field trip to the fact that she had a tendency to become dizzy or disoriented when she consumed alcohol. Equally important, Beach told Cuellar after that incident that what had occurred was not normal behavior for her.

At the time of the final field trip, Beach had attended other field trips and had had no further incidents. She evidenced the judgment and skills of any normal twenty-year-old college student. There was nothing to suggest that she was not in good physical condition; in fact, on the final trip she joined several other students in rappelling from rocks located just above the area where she was later injured. Cuellar testified that on the night of the accident, he did not know that Beach in particular had been drinking. Indeed, Beach testified that when she left the van for her tent, her behavior was normal and would not have suggested to any observer that she was intoxicated or disoriented.

■ Under these circumstances, we conclude as a matter of law that Beach's situation was not distinguishable from that of the other students on the trip; therefore, no special relationship arose between the University and Beach. Nothing Cuellar knew would have led him to conclude that if he did not walk Beach to her tent and see that she was down for the night, she might wander off and be injured. Because no special relationship existed, the University had no affirmative obligation to protect or supervise her and no duty was breached.

■ Beach raises several other arguments in support of her claim that a special relationship existed between herself and the University or that some other duty was breached, none of which are persuasive. First, she claims that Cuellar failed to properly instruct her in camping skills as re-

---

examples of special relationships include common carriers and passengers, employers and employees, owners and invitees, and parents and children. 663 P.2d at 435. Other situations involve innkeepers and their guests, *Mitchell v.*

*Pearson Enterprises,* 697 P.2d 240, 243 (Utah 1985), and possessors of land and their guests. Restatement (Second) of Torts § 314(A)(3) (1964).

quired by the University's regulations on student safety and that his failure to do so proximately caused her injuries. But even if we assume that there was such a duty and that it was breached, liability could not result. There is no evidence that Beach's injuries could have been avoided if she had possessed better camping skills. According to Beach's own testimony, her injuries were caused by her wandering into the night in an intoxicated and/or disoriented state. She cannot remember what occurred after she decided to retrace her steps to the camp. Under the circumstances, a jury could not permissibly find any nexus between the University's duty to instruct Beach in camping skills and her injuries.

■ Beach next contends that Cuellar had a duty to refrain from drinking at University functions and to enforce University rules and state laws proscribing underage drinking and drinking at University functions. She claims that had Cuellar abstained from drinking, he would have been able to properly supervise the students. This argument is unpersuasive. First, the record does not establish that Cuellar was intoxicated and unable to supervise his students. But, even if Cuellar had a duty to avoid drinking, there is no evidence that his breach of that duty had any causal connection with Beach's injuries. As has been noted, the facts known to Cuellar on the

night in question—assuming that he was sober—could not have alerted him to the need to take special precautions regarding Beach.

Cuellar's failure to enforce the state law and university rule against underage drinking raises a more difficult issue. Utah law prohibits the consumption of alcohol by those under twenty-one years of age. U.C.A., 1953, § 32A–12–13(1) (1986 ed.). There is evidence from which a jury could find that at the time of the accident the University's rules required students to obey state law regarding the consumption of alcohol. The question before us is whether, by reason of the state statute or the University's rule, a special relationship arose between underage students and the University requiring the University to protect these students from their voluntary off-hours intoxication during a field trip sponsored by the University.[3] If such a relationship existed, a question of fact would be presented as to whether the breach of this duty caused Beach's injuries.

Beach argues that a special relationship, arising out of the state statute prohibiting alcohol consumption by minors and the University's corollary rule, should be deemed to exist for a number of policy reasons. At bottom, however, Beach simply claims that a large, modern university has a custodial relationship with its adult students and that this relationship imposes upon it the

---

**3.** There is no claim here that the University furnished alcohol to Beach. It is uncertain whether such a fact would have made any difference in this case. Utah law prohibits the furnishing of alcohol to a minor. U.C.A., 1953, § 32A–12–8 (1986 ed.). We have held that such a statutory violation can be used to prove negligence on the part of the vendor in an action brought by one injured by the intoxicated minor. *Yost v. Utah,* 640 P.2d 1044 (Utah 1981); *see also Rees v. Albertson's, Inc.,* 587 P.2d 130 (Utah 1978) (intoxicated minor is entitled to have a determination made as to the seller's misconduct in providing him with beer in action for contribution). Dictum in *Yost* suggests, however, that Utah recognizes no common law right of action against a provider of alcohol based upon the fact that the alcohol was furnished in violation of the law. 640 P.2d at 1046. If this dictum is accurate, any liability premised directly on the illegal furnishing of alcohol

would have to arise from a statutory provision. The Utah Dramshop Act, initially enacted in 1981 and repealed and reenacted in 1985, provides that one who "gives, sells, or otherwise provides liquor" to a person under twenty-one who becomes intoxicated as a result and who injures another because of the intoxication is liable to third parties for damages. U.C.A., 1953, § 32A–14–1 (1986 ed.); *see* 1981 Utah Laws ch. 152. The Dramshop Act allows third parties to recover from those improperly providing liquor, but does not allow the intoxicated person to recover from the provider. Therefore, one injured as a result of his or her own voluntary but unlawful intoxication would appear to be without remedy against the provider of the alcohol, either under the Dramshop Act or under common law. *Cf. Miller v. City of Portland,* 288 Or. 271, 279, 604 P.2d 1261, 1264–65 (1980).

duty to prevent students from violating liquor control laws whenever those students are involved directly or indirectly in a University activity. We cannot agree.

Determining whether one party has an affirmative duty to protect another from the other's own acts or those of a third party requires a careful consideration of the consequences for the parties and society at large. If the duty is realistically incapable of performance, or if it is fundamentally at odds with the nature of the parties' relationship, we should be loath to term that relationship "special" and to impose a resulting "duty," for it is meaningless to speak of "special relationships" and "duties" in the abstract. These terms are only labels which the legal system applies to defined situations to indicate that certain rights and obligations flow from them; they are "an expression of the sum total of those considerations of policy which lead the law to say that a particular plaintiff is entitled to protection." W. Prosser, *Law of Torts* 333 (3d ed. 1964), *quoted in Bradshaw v. Rawlings*, 612 F.2d 135, 138 (3d Cir.1979), *cert. denied*, 446 U.S. 909, 100 S.Ct. 1836, 64 L.Ed.2d 261 (1980).

Two courts recently have addressed the fundamental policy implications inherent in claims by students against colleges for damages resulting from underage drinking. The Third Circuit dealt with these questions persuasively in *Bradshaw v. Rawlings*, 612 F.2d 135 (3d Cir.1979), *cert. denied*, 446 U.S. 909, 100 S.Ct. 1836, 64 L.Ed.2d 261 (1980). That analysis was followed by the California Court of Appeal in *Baldwin v. Zoradi*, 123 Cal.App.3d 275, 176 Cal.Rptr. 809 (Ct.App.1981). We find the *Bradshaw* court's reasoning equally applicable here. Given the extensive discussion contained in these cases, we will only briefly recapitulate the pertinent policy considerations as they relate to Beach's situation.

The students whose relationship to the University we are asked to characterize as "custodial" are not juveniles. Beach was twenty years of age at the time of the accident. She may have been denied the right to drink by Utah law, but in virtually all other respects she was entitled to be treated as an adult. She had a constitutional right to vote, U.S. Const. amend. XXVI, § 1, she was to be chargeable on her contracts, U.C.A., 1953, §§ 15–2–1 and 2 (1986 ed.), and if she had committed a crime, she would be tried and sentenced as an adult. U.C.A., 1953, §§ 78–3a–2 and 16 (1977 ed., Supp.1986). Had she not been a college student, but an employee in industry, she could not argue realistically that her employer would be responsible for compensating her for injuries incurred by her voluntary intoxication if she violated state liquor laws during her off-hours while traveling on company business. We do not believe that Beach should be viewed as fragile and in need of protection simply because she had the luxury of attending an institution of higher education.

Not only are students such as Beach adults, but law and society have increasingly come to recognize their status as such in the past decade or two.[4] Nowhere is this more true than in the relations between students and institutions of higher education. As the Third Circuit explained in *Bradshaw v. Rawlings*:

> [T]here was a time when college administrators and faculties assumed a role *in loco parentis*. Students were committed to their charge because the students were considered minors.... The campus revolutions of the late sixties and early seventies were a direct attack by the students on rigid controls by the colleges and were an all-pervasive af-

4. The twenty-sixth amendment to the United States Constitution, which was adopted in 1971 and guarantees those persons eighteen years of age or older the right to vote, is a pivotal consideration in our analysis. We find unpersuasive the argument that college students—the great majority of whom are over eighteen years old— are so immature that they should be considered wards of their particular institution of higher education while the people of this country have found those same students as a whole to be mature enough to exercise the most sacred right a democracy can bestow.

firmative demand for more student rights. In general, the students succeeded ... in acquiring a new status at colleges throughout the country. These movements, taking place almost simultaneously with legislation and case law lowering the age of majority, produced fundamental changes in our society. A dramatic reapportionment of responsibilities and social interests of general security took place. Regulation by the college of student life on and off campus has become limited.

....

Thus, for purposes of examining fundamental relationships that underlie tort liability, the competing interests of the student and of the institution of higher learning are much different today than they were in the past. At the risk of oversimplification, the change has occurred because society considers the modern college student an adult, not a child of tender years.

612 F.2d at 139–40.

■ We also must consider the nature of the institution. Elementary and high schools certainly can be characterized as a mixture of custodial and educational institutions, largely because those who attend them are juveniles. However, colleges and universities are educational institutions, not custodial. *Accord Baldwin v. Zoradi,* 123 Cal.App.3d at 281–82, 176 Cal.Rptr. at 813. Their purpose is to educate in a manner which will assist the graduate to perform well in the civic, community, family, and professional positions he or she may undertake in the future. It would be unrealistic to impose upon an institution of higher education the additional role of custodian over its adult students and to charge it with responsibility for preventing students from illegally consuming alcohol and, should they do so, with responsibility for

assuring their safety and the safety of others. *Accord Bradshaw v. Rawlings,* 612 F.2d at 138; *Baldwin v. Zoradi,* 123 Cal.App.3d at 290–91, 176 Cal.Rptr. at 818. Fulfilling this charge would require the institution to babysit each student, a task beyond the resources of any school. But more importantly, such measures would be inconsistent with the nature of the relationship between the student and the institution, for it would produce a repressive and inhospitable environment, largely inconsistent with the objectives of a modern college education.[5] The words of the California Court of Appeal in *Baldwin v. Zoradi* are apt:

The transfer of prerogatives and rights from college administrators to the students is salubrious when seen in the context of a proper goal of postsecondary education—the maturation of the students. Only by giving them responsibilities can students grow into responsible adulthood. Although the alleged lack of supervision had a disastrous result to this plaintiff, the overall policy of stimulating student growth is in the public interest.

123 Cal.App.3d at 291, 176 Cal.Rptr. at 818.

■ A realistic assessment of the nature of the relationship between the parties here precludes our finding that a special relationship existed between the University and Beach or other adult students. Our conclusion is not affected by the presence of any university rules that might have existed regarding the consumption of alcohol, over and above the state ban on underage drinking. The *Bradshaw* court was faced with a similar claim that the consumption in question violated college regulations. It reasoned that

[a] college regulation that essentially tracks a state law and prohibits conduct that to students under twenty-one is al-

---

**5.** This is not to say that an institution might not choose to require of students certain standards of behavior in their personal lives and subject them to discipline for failing to meet those standards. However, the fact that a student might accept those conditions on attendance at the institution would not change the character of their relationship; the student would still be an adult and responsible for his or her behavior. Neither attendance at college nor agreement to submit to certain behavior standards makes the student less an autonomous adult or the institution more a caretaker.

ready prohibited by state law, does not, in our view, indicate that a college voluntarily assumed a custodial relationship with its students [for tort analysis purposes].

612 F.2d at 141. We agree. The behavior code established by the University may permit discipline of students for infractions, but it certainly does not change the nature of their relationship. *See* note 5, *supra.*

For the foregoing reasons, we conclude that the University breached no duty to Beach and the trial court properly granted defendants' motion for summary judgment. Its decision is affirmed.

HALL, C.J., and STEWART, HOWE and DURHAM, JJ., concur.