Kathy Lynn **HIGGINS, individually and as guardian ad litem for Shaundra Higgins, her daughter, Plaintiff and Appellant,**

v.

**SALT LAKE COUNTY, William Kuentzel, Sheryl Steadman, The University of Utah, The University Medical Center, Caroline Trujillo, and John Does 1 through 10, Defendants and Appellees.**

No. 900255.

Supreme Court of Utah.

May 14, 1993.

Rehearing Denied June 28, 1993.

Rodney G. Snow, James L. Warlaumont, Neil A. Kaplan, Stephen G. Stoker, Salt Lake City, and David B. Thomas, Provo, for the Higginses.

David E. Yocom, Patricia J. Marlowe, Salt Lake City, for the County.

Ronald E. Nehring, Salt Lake City, for Valley Mental Health.

Stephen J. Hill, Salt Lake City, for University of Utah and University Medical Center.

ZIMMERMAN, Justice:

This case is before us on appeal from summary judgment in favor of defendants Salt Lake County, Dr. William Kuentzel, Sheryl Steadman, and the University of Utah. Plaintiff Kathy Lynn Higgins, who is suing individually and as guardian ad litem for her daughter Shaundra Higgins, argues that the trial court erred in ruling that defendants owed no duty to protect either her or her daughter from a potentially dangerous mental patient. We conclude that the trial court erred in finding no duty but affirm the lower court's summary judgment on the alternative ground that governmental immunity bars Higgins's action.

Before we recite the facts, we note that in reviewing a grant of summary judgment, we view the facts and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party. *E.g., Smith v. Batchelor,* 832 P.2d 467, 468 (Utah 1992); *Rollins v. Petersen,* 813 P.2d 1156, 1158 (Utah 1991); *Utah State Coalition of Senior Citizens v. Utah Power & Light,* 776 P.2d 632, 634 (Utah 1989). We state the facts in this case accordingly.

*See Sandy City v. Salt Lake County,* 827 P.2d 212, 215 (Utah 1992).

On April 10, 1984, Carolyn Trujillo, a voluntary patient at Salt Lake County Mental Health ("SLCMH"),[1] stabbed then ten-year-old Shaundra. Trujillo had been diagnosed as a paranoid schizophrenic with organic brain dysfunction and marginal intelligence. Her mental illness manifested itself when she was a teenager and was complicated by her abuse of illegal drugs. Prior to the stabbing, she had been an involuntary patient four times at the University of Utah Medical Center ("UMC") and twice at the Utah State Hospital. In late 1975, following Trujillo's release from her first hospitalization at UMC, Sheryl Steadman, a registered nurse, was assigned as Trujillo's primary therapist.

In July of 1981, Ogden police charged Trujillo with assault and disorderly conduct after she struck a woman and a child. Trujillo pleaded guilty in an Ogden court to disorderly conduct. Before sentencing, however, she stabbed an elderly woman in the buttocks in Salt Lake City and was charged with aggravated assault. The Salt Lake court committed her to the Utah State Hospital for a thirty-day evaluation to determine her competency to stand trial. On December 1, 1981, she was found incompetent to stand trial on the aggravated assault charge and pleaded no contest to the reduced charge of simple assault several days later. She was placed on probation for one year. As a condition of probation, Trujillo was ordered to enter a residential mental health program at Salt Lake County's Adult Residential Treatment Unit ("ARTU") in Salt Lake City.

In February of 1982, the Ogden court placed Trujillo on one year's probation in connection with the disorderly conduct charge. As a condition of probation, Trujillo was ordered to take her medications and continue her treatment at ARTU. In January of 1983, Trujillo's probation officer recommended that both the Ogden and Salt Lake City probation orders be terminated

---

1. Salt Lake County Mental Health consists of three mental health systems: Salt Lake, Granite, and Copper Mountain. Each system was established by Salt Lake County; the three were consolidated in approximately 1982 to form Salt Lake County Mental Health.

because Trujillo had complied with the conditions of both. Her probations in Ogden and Salt Lake City were subsequently terminated.

In February of 1984, Trujillo superficially cut her wrists. Two days later, she and her mother went to the UMC emergency room and requested that Trujillo be hospitalized. The request was denied, allegedly due to a shortage of beds, but Katy Jones, a crisis specialist on the UMC staff, referred Trujillo to ARTU for a crisis stay. When Trujillo arrived at ARTU on that Saturday, Larry Romero, a crisis line operator who was not authorized to diagnose patients, created a treatment plan for Trujillo that called for a short stay to assess her living environment. Dr. Joy Ely, a part-time psychiatrist at ARTU, saw Trujillo the following Monday. Trujillo was discharged from ARTU on March 14, 1984, and was placed in an evening/weekend program, a move calculated to ease her transition from the institution to society. She attended several, but not all, sessions through the end of the month and last saw Steadman on March 21, 1984. At this meeting, Steadman found Trujillo to be stable.

On April 10, 1984, Trujillo was alone at her home when she heard voices telling her "to stab someone." She left the house and began walking toward a nearby alley. When she spotted Shaundra, a child she knew from the neighborhood, she followed the girl into the alley next to her house. Trujillo called to Shaundra and then stabbed the girl three times, severing her aorta and puncturing her abdomen. Despite her injuries, Shaundra survived the attack.

Higgins claims that Trujillo had been brooding over and planning to hurt Shaundra for six months before the attack. However, in an interview with police detectives after the stabbing, Trujillo said that she had no particular victim in mind when she armed herself with a knife and left her room. She told the detectives that she intended to stab "[j]ust anybody." In a subsequent interview, Trujillo told a psychiatrist that even though she was not looking for Shaundra at the time of the stabbing, she believed that Shaundra had struck her six-year-old daughter. She also said that she hated Higgins because Higgins refused to give her cigarettes and was "a slut."

Trujillo was found "guilty and mentally ill" of the charge of attempted criminal homicide, a second degree felony, and was committed to the Utah State Hospital.[2] Shortly thereafter, Higgins sued Salt Lake County and the University of Utah, claiming that they owed her and her daughter a duty to control and/or to treat Trujillo correctly and that if defendants had performed their professional duties properly, the stabbing would not have occurred. Higgins sought damages for her own emotional distress and for physical and emotional injuries to her daughter.

Higgins asserted the following specific allegations of negligence as a basis for her suit. First, she contended that the University of Utah was negligent in its treatment of Trujillo in that UMC's crisis specialist, nurse Jones, was negligent in her diagnosis, treatment, and failure to have Trujillo involuntarily committed or voluntarily admitted to the hospital after her suicide attempt. Particularly, Higgins asserted that Jones (i) never reviewed Trujillo's medical records, (ii) did not involve qualified personnel in evaluating Trujillo, and (iii) never evaluated Trujillo's threat to others in the community.

Second, Higgins contended that Salt Lake County was negligent in its diagnosis, supervision, treatment of, and failure to commit Trujillo. Specifically, she alleged that (i) therapist Steadman prescribed improper medication for Trujillo, (ii) crisis worker Romero was unqualified to diagnose or create a treatment plan, and (iii) Dr. Ely was unqualified to handle Trujillo's case and failed to review Trujillo's medical records or consult with qualified personnel. The trial court granted summary judgment

**2.** After spending approximately nine months in the Utah State Hospital, Trujillo appeared in court again and pleaded guilty to attempted manslaughter, a third degree felony. She was then sentenced to the Utah State Prison for a term not to exceed five years.

for defendants on the ground that they owed no duty of care to either Higgins or her daughter. Higgins appeals.

We first state the applicable standard of review. Summary judgment is appropriate only when no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Utah R.Civ.P. 56(c); *Sandy City*, 827 P.2d at 214; *Rollins*, 813 P.2d at 1159; *Landes v. Capital City Bank*, 795 P.2d 1127, 1129 (Utah 1990). Because entitlement to summary judgment is a question of law, no deference is due the trial court's determination of the issues presented. However, we may affirm a grant of summary judgment on any ground available to the trial court, even if it is one not relied on below. *See Hill v. Seattle First Nat'l Bank*, 827 P.2d 241, 246 (Utah 1992).

With this standard in mind, we turn to the issues on appeal, which are as follows: First, assuming that defendants may have failed to use reasonable care in treating, supervising, diagnosing, and not committing Trujillo, did defendants owe a duty to the Higginses, and if so, did such acts and omissions breach that duty? Second, even if there was such a breach of duty, does the Governmental Immunity Act, Utah Code Ann. § 63–30–10, bar Higgins's claims? We discuss these issues in turn.[3] As the trial court recognized below, the proper sequence of analysis is to determine, first, whether defendants had a duty to the Higginses and, if so, whether they breached that duty, and second, whether governmental immunity shields defendants from suit. *Rollins*, 813 P.2d at 1162 n. 3.

█ We begin with the question of defendants' duty to the Higginses. Duty is an essential element of negligence. *E.g.*, *Rollins*, 813 P.2d at 1159; *Ferree v. State*,

784 P.2d 149, 151 (Utah 1989); *Beach v. University of Utah*, 726 P.2d 413, 415 (Utah 1986). Unless defendants owed a duty to the Higginses, there is no cause of action. Higgins advances several theories upon which to base a finding of duty. These theories have two basic conceptual themes: first, that defendants owed a general duty to any third party foreseeably at risk from their negligence in treating and supervising Trujillo, and second, that a special relationship existed between defendants and Trujillo that gave rise to a duty by defendants to the Higginses.

We reject the first of these grounds as being contrary to established precedents in this and other states. As we recently explained, "Because people are inherently less controllable than physical things, the common law has imposed no duty to control the conduct of others except in certain circumstances, as where a special relationship exists."[4] *Trapp v. Salt Lake City Corp.*, 835 P.2d 161, 161 (Utah 1992). The soundness of this limitation on liability as it operates in the context of a patient/therapist relationship is plain. First, given the empirically demonstrated inability of trained healthcare professionals to reliably predict future dangerousness, the legal limitations on the involuntary confinement of mental patients, and the need for a confidential relationship between care providers and patients for therapy to succeed, the general duty that plaintiffs would have us impose would be both realistically incapable of performance and inconsistent with the basic relationship between therapist and patient. *See* Jerome S. Beigler, *Tarasoff v. Confidentiality*, 2 Behav.Sciences & L. 273, 277–79 (1984) [hereinafter Beigler]; John G. Fleming & Bruce Maximov, *The Patient or His Victim: The Therapist's*

---

3. Higgins also claims negligent infliction of emotional distress. However, we find no reason to address this claim because it is disposed of by *Hansen v. Sea Ray Boats, Inc.*, 830 P.2d 236 (Utah 1992).

4. For similar reasons, we reject Higgins's related argument that we should extend the duty imposed on doctors for negligent treatment of infectious or contagious diseases to the psychotherapist's negligent treatment of a dangerous

patient. This attempted analogy fails for the following reasons: First, infectious diseases are generally more identifiable than dangerous mental illness; second, there is more certainty of harm with an infectious disease than from a patient who may be labeled "dangerous"; and third, the means of preventing harm from an infectious disease are usually less restrictive of personal freedom than the means used to prevent harm from those with mental illness.

*Dilemma,* 62 Cal.L.Rev. 1025, 1044–45 (1974) [hereinafter Fleming & Maximov]; Mark J. Mills, *The So–Called Duty to Warn: The Psychotherapeutic Duty to Protect Third Parties from Patients' Violent Acts,* 2 Behav.Sciences & L. 237, 241 (1984) [hereinafter Mills]; David L. Faigman, *To Have and To Have Not: Assessing the Value of Social Science to the Laws as Science and Policy,* 38 Emory L.Rev. 1005, 1076 (1989).

Second, in part because the proposed duty is incompatible with the real world environment in which patients and healthcare professionals coexist, this ill-defined, amorphous duty would invite jury hindsight bias. *See* Robert F. Schopp & David B. Wexler, *Shooting Yourself in the Foot with Due Care: Psychotherapists and Crystallized Standards of Tort Liability,* J.Psychiatry & L. 163, 165 (Summer 1989) [hereinafter Schopp & Wexler]. The resulting duty to the general public would "closely approximate a strict liability standard of care, and therapists would be potentially liable for all harm inflicted by persons presently or formerly under psychiatric treatment." *Cooke v. Berlin,* 153 Ariz. 220, 735 P.2d 830, 836 (Ariz.Ct.App. 1987) (quoting *Brady v. Hopper,* 570 F.Supp. 1333, 1339 (D.Colo.1983), *aff'd,* 751 F.2d 329 (10th Cir.1984)); *accord Abernathy v. United States,* 773 F.2d 184, 190 (8th Cir.1985).

Finally, we note that these defendants are public entities or employees who are charged with protecting the well-being of the general public. *See Obray v. Malmberg,* 26 Utah 2d 17, 484 P.2d 160, 162 (1971). However, "[f]or a governmental agency and its agents to be liable for negligently caused injury suffered by a member of the public, the *plaintiff must show a breach of a duty owed him [or her] as an individual, not merely the breach of an obligation owed to the general public at large by the governmental official." Ferree,* 784 P.2d at 151 (emphasis added); *accord Owens v. Garfield,* 784 P.2d 1187, 1189 n. 2 (Utah 1989).

Higgins presents us with no persuasive reasons for departing from our precedents and sacrificing these important policy considerations. We refuse to adopt the general negligence scheme they propose.

The second ground for the Higginses' claim of duty, the special relationship theory, requires more extended analysis. Higgins argues that defendants had a "special relationship" with Trujillo that gave rise to a duty to keep her from harming third parties that were foreseeably at risk from her, including the Higginses. Because an understanding of the special relationship doctrine is crucial to this discussion, we begin with a brief review of the concept. Section 315 of Restatement (Second) of Torts sets out a formulation of this doctrine. It provides two exceptions to the general rule that one has no duty to control the conduct of third persons. Section 315 states:

> There is no duty to control the conduct of a third person so as to prevent him [or her] from causing physical harm to another unless
>
> (a) a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct, or
>
> (b) a special relation exists between the actor and the other which gives the other a right to protection.

Restatement (Second) of Torts § 315 (1977). These exceptions are further elaborated upon in sections 314 and 319 of the Restatement. *See Rollins,* 813 P.2d at 1159–60.

In Utah, we have applied the Restatement's special relationship exception to the general rule that there is no duty to control the conduct of third persons. *See Rollins,* 813 P.2d at 1159. However, unlike the Restatement writers, we do not attempt in our duty analysis to rigorously maintain the artificial categorization that differentiates between cases based on whether the actor owes the duty to the victim or to the victimizer, *e.g.,* Restatement (Second) of Torts §§ 314, 315, 319, nor do we apply the Restatement's precise formulation uncritically. Instead, we have taken a policy-based approach in determining whether a special relation should be said to exist and consequently whether a duty is owed. *Rol-*

*lins,* 813 P.2d at 1161; *Ferree,* 784 P.2d at 151–52; *Beach,* 726 P.2d at 415; *see Owens,* 784 P.2d at 1193 (Zimmerman, J., concurring specially, joined by Hall, C.J., and Howe, Assoc. C.J.).

■ Determining whether the actor has a duty to prevent another's harm requires careful consideration of the consequences of imposing that duty for the parties and for society. *Beach,* 726 P.2d at 418. We are loath to recognize a duty that is realistically incapable of performance or fundamentally at odds with the nature of the parties' relationship. *Id.* Accordingly, in determining the existence of a duty, we examine such factors as the identity and character of the actor, the victim, and the victimizer, the relationship of the actor to the victim and the victimizer, and the practical impact that finding a special relationship would have. *See Rollins,* 813 P.2d at 1160. As we explained in *Beach:*

> [I]t is meaningless to speak of "special relationships" and "duties" in the abstract. These terms are only labels which the legal system applies to defined situations to indicate that certain rights and obligations flow from them; they are "an expression of the sum total of those considerations of policy which lead the law to say that a particular plaintiff is entitled to protection."

*Beach,* 726 P.2d at 418 (quoting William Prosser, *Law of Torts* 333 (3d ed.1964)).

In *Beach, Ferree,* and *Rollins,* we performed this sort of pragmatic, policy-based analysis in the context of claims that an injured party, as a member of a large undifferentiated group, such as a university student body (*Beach*) or the general public (*Ferree* and *Rollins*), was owed a duty by a defendant to protect the injured party from self-created dangers (*Beach*) or from injuries by third parties under the custody or control of the defendant (*Ferree* and *Rollins*). In each, we concluded that if the broad claim for a special relationship and the consequent duty was accepted, the defendant in question would be unable to perform the duty without either radically changing its character or drastically circumscribing the function it was charged with performing. *Rollins,* 813 P.2d at 1161; *Ferree,* 784 P.2d at 151; *Beach,* 726 P.2d at 419–20.

■ A general principle can be drawn from these cases. In the context of a claim that an actor having custody or control of another owed a duty to prevent harm to or by that other, our overriding practical concern is whether the one causing the harm has shown him- or herself to be uniquely dangerous so that the actor upon whom the alleged duty would fall can be reasonably expected, consistent with the practical realities of that actor's relationship to the one in custody or under control, to distinguish that person from others similarly situated, to appreciate the unique threat this person presents, and to act to minimize or protect against that threat. When such circumstances are present, a special relationship can be said to exist and a duty sensibly may be imposed. *E.g., Rollins,* 813 P.2d at 1162.

■ It is important to recognize that in the above-referenced cases, we did not reject the possibility of a duty flowing from these institutions to specific individuals or narrow classes of individuals who for some reason were distinguishable from the mass; we only rejected the claims for broad categories of special relationships which operatively seem to be indistinguishable from a general negligence theory. *Id.* at 1159–62; *Ferree,* 784 P.2d at 151–52; *Beach,* 726 P.2d at 416. As we held in *Rollins,* this analysis produces results that appear to diverge from sections 314, 315, and 319 of the Restatement. 813 P.2d at 1161–62. However, we think our approach is more realistic than that which would result from a broad reading of the Restatement, especially when one considers the fact that at bottom, the issue is one of negligence—a lack of reasonable care—as opposed to what actions of others it would be nice to be insured against.[5]

---

**5.** Defendants correctly argue that many courts have identified the actor's legal ability to control the third person as the factor that determines the existence of a special relationship. *See, e.g., Hokansen v. United States,* 868 F.2d 372, 377 (10th Cir.1989); *Abernathy,* 773 F.2d at 189–90;

■ With this background in mind, we turn to the facts of this case. We begin with the question of whether defendants had a special relationship with Trujillo. Higgins argues that a special relationship exists between every therapist and every patient, the breach of which results in liability to anyone injured as a consequence. Therefore, she claims, each defendant has a special relationship with Trujillo that required committing or voluntarily admitting her. We reject this argument. Under the *Beach / Ferree / Rollins* analytical model, the fact that a relationship between one person and another can be characterized as "special" for some purposes does not determine whether that relation is special for purposes of imposing a tort duty in contravention of the general rule that one has no duty to control another person's actions. As we noted in *Beach*, the characterization of a relationship as special is a conclusion, a label that announces the results of a policy analysis, not a substitute for analysis. 726 P.2d at 417–18. Higgins offers no analysis beyond labels to support her argument.

■ Higgins's second special relationship theory is that defendants owed her and her daughter a duty to control Trujillo, a dangerous person, because of Trujillo's special relationship to defendants. Our decision in *Rollins*, which built upon *Beach* and *Ferree*, sets the standard that governs this issue. There, in the context of an action against the state hospital for harm caused to a member of the public by an escaped patient, we held that before we would impose a duty on a hospital to those harmed by a patient, it must be shown that the custodian knew or should have known that unless steps were taken to protect others from the detainee, he or she was "likely" to cause bodily harm to persons who were "reasonably identifiable by the custodian either individually or as members of a distinct group." *Rollins*, 813 P.2d at 1162. We elaborated that "for a person or group to be reasonably identifiable, the bodily harm caused will be of a type that the custodian knew or should have known the detainee was likely to cause if not controlled." *Id.* We reasoned that when the theoretical danger of the one in custody became sufficiently crystallized that it took on a specific object and means, it became reasonable to impose a duty for two reasons: First, the detainee has been distinguished from the remainder of the population, and second, the identification of a victim and a means has made it feasible for the custodian to take concrete steps to prevent the harm. *Id.*

This same test seems suited to the instant case. Here, the patient may be voluntary, but the other characteristics of the parties' relationship are substantially similar to those in *Rollins*. The patient is mentally ill, presenting at least the potential of danger to self or others; the therapist is charged by his or her professional role to provide care for the patient in a confidential provider/patient relationship with a view toward recovery and return to normal life; and the therapist is legally restricted in using confinement to those situations in which the patient presents an identifiable danger to self or others and then must use the minimum level of confinement necessary. *See* Utah Code Ann. §§ 62A–12–222, –234(10)(d), –235(2), –241;

---

*Hasenei v. United States*, 541 F.Supp. 999, 1009 (D.Md.1982); *Cooke*, 735 P.2d at 836; *Perreira v. State*, 768 P.2d 1198, 1215–16 (Colo.1989); *Johnson Estate v. Condell Memorial Hosp.*, 119 Ill.2d 496, 117 Ill.Dec. 47, 51, 520 N.E.2d 37, 41 (1988). Here, defendants contend that because Trujillo was a voluntary patient, they lacked the ability to control her and therefore could not have a special relationship with her.

We have employed this legal-power-to-control analysis ourselves in certain cases. *See Doe v. Arguelles*, 716 P.2d 279, 282 (Utah 1985); *Little v. Division of Family Servs.*, 667 P.2d 49, 54–55 (Utah 1983). At the same time, however, we have moved away from an exclusive reliance on this factor, just as we do not rely on the Restatement's mechanistic relational models in deciding whether a duty exists. Instead, we have concentrated on broader public policy concerns to determine whether the relationship gives rise to an affirmative duty to control another. *See, e.g., Rollins*, 813 P.2d at 1161–62; *Ferree*, 784 P.2d at 151; *Beach*, 726 P.2d at 418. The legal ability to control a third party may figure in this public policy analysis, but it is only one factor to consider and is not determinative of whether a special relationship exists.

*O'Connor v. Donaldson*, 422 U.S. 563, 576, 95 S.Ct. 2486, 2494, 45 L.Ed.2d 396 (1975).

Limiting the duty to third parties who are "reasonably identifiable by the [therapist] either individually or as [a] member[ ] of a distinct group," *Rollins*, 813 P.2d at 1162, permits us, in most instances, to uphold the public policies of protecting the traditional confidentiality of the provider/patient relationship, which is important both for privacy reasons and for the efficacy of the therapeutic relationship. At the same time, it ensures the minimum use of involuntary commitment consistent with protecting identifiable potential victims. *See* Schopp & Wexler at 183; Robert F. Schopp & Michael R. Quattrocchi, *Tarasoff, the Doctrine of Special Relationships and the Psychotherapist's Duty to Warn*, J.Psychiatry & L. 13, 23 (Spring 1984) [hereinafter Schopp & Quattrocchi]; Fleming & Maximov at 1032; Beigler at 277; Mills at 250–51.

Moreover, by adopting this standard for voluntary and involuntary health-care provider/patient relationships, we limit the duty to take steps to protect others by imposing a high level of confinement upon the patient to situations in which it is arguably possible for the therapist to distinguish between those who do present a real danger and those who do not. Any broader duty would be realistically incapable of performance. This consideration is important and, to a degree, implicitly underlies our decisions in *Ferree* and *Rollins*. The empirical evidence that has come to our attention is almost unanimous that dangerousness cannot be predicted with any degree of success. *See, e.g.*, Schopp & Quattrocchi at 23. "Not only have psychologists and psychiatrists been unable to predict dangerousness to a degree of accuracy which would justify infringing on a client's rights, they have been unable to predict any more accurately than have nonprofessionals." *Id;* Robert M. Wettstein, *The*

*Prediction of Violent Behavior and the Duty to Protect Third Parties*, 2 Behav.Sciences & L. 291 (1984); *accord* Beigler at 280–82. For this reason, we limit the imposition of a duty to protect to those situations identified in *Rollins* in which there is an overt indication that the one in custody or under treatment is distinguishable from the mass of those in custody or under treatment, all of whom might be said in general terms to be dangerous to someone. *See* Schopp & Wexler at 173.[6]

■ Applying this standard to the facts before us, we find that Trujillo never actually distinguished herself from the other potentially dangerous patients by threatening an identifiable victim. Trujillo's stabbing of an elderly woman three years before her attack on Shaundra did not make Shaundra an identifiable victim or even a member of a distinct, identifiable class. As far as the record reveals, Shaundra and the elderly woman had nothing in common but gender. The entire undifferentiated female half of the population does not comprise a distinct, identifiable group.

However, this conclusion does not end the matter. While Trujillo may not have identified Shaundra as a potential victim, Higgins contends that if defendants had performed their professional responsibilities properly, Trujillo would have revealed Shaundra as a potential target. Higgins argues that Trujillo did not reveal her obsession with Shaundra because of defendants' negligent treatment and therefore that negligence should not excuse defendants from a duty that would have arisen had they acted in accordance with the appropriate standard of care. Otherwise, they say, care providers would have an incentive to avoid diagnostically appropriate examinations that could reveal specific threats and give rise to a special relationship and the consequent duty to the potential victim.

**6.** Although we reach this holding solely on common law grounds, we note that this result is consistent with legislation enacted five years after Shaundra was stabbed. That statute provides, "A therapist has no duty to warn or take precautions to provide protection from any violent behavior of his [or her] client or patient, except when that client or patient communicated to the therapist an *actual* threat of physical violence against a clearly identified or reasonably identifiable victim." Utah Code Ann. § 78–14a–102(1) (emphasis added).

As stated in *Rollins,* we will find a special relationship and consequent duty when a defendant knew of the likely danger to an individual or distinct group of individuals or when a defendant should have known of such danger.[7] 813 P.2d at 1162. In the context of the present case, if the steps taken by defendants were not reasonable in light of Trujillo's symptoms and if reasonable action would have revealed that Trujillo was likely to inflict grievous bodily harm on Shaundra, then a special relationship would arise. Higgins's factual allegation that proper examination and diagnosis would have disclosed that Trujillo was brooding over Shaundra and had targeted her for an attack presents a sufficient claim that a duty existed. Consequently, the trial court should not have granted summary judgment for defendants on the duty issue.

■ Having concluded that the trial court erred in basing its summary judgment on the lack of duty, we must next address a question not reached by the trial court: Are defendants immune from suit under the provisions of the Governmental Immunity Act ("the Act")?

In structure, the Act grants immunity to all persons performing governmental functions but then withdraws that immunity for certain persons under certain circumstances and with certain exceptions. Utah Code Ann. § 63–30–3. Both plaintiffs and defendants agree that UMC and SLCMH were performing governmental functions within the meaning of the Act. Therefore, they are immune from suit unless the Act waives that immunity and does not provide an applicable exception to that waiver.

The Act waives immunity for an "injury proximately caused by a negligent act or omission of an employee committed within the scope of employment except if the injury ... (b) arises out of assault, battery...." *Id.* § 63–30–10(1)(b) (1986) (now codified at § 63–30–10(2)) (emphasis added).

Defendants contend that the Act bars Higgins's claim because Shaundra's injuries and Higgins's mental distress arose out of Trujillo's assault and battery. Higgins responds that section 63–30–10 does not preserve immunity for injuries arising from an assault or battery if the assailant is not a governmental employee.

Under the logic of *Ledfors v. Emery County School District,* 849 P.2d 1162 (1993), we find Higgins's argument to be without merit. First, by its plain language, section 63–30–10 preserves immunity for negligence that results in an "injury ... [that] arises out of [an] assault, [or] battery...." Utah Code Ann. § 63–30–10(1)(b) (1986) (now codified at § 63–30–10(2)). The statute simply does not contain the distinction on which Higgins stakes her claim. In fact, its language suggests that the legislature contemplated no such distinction. The section in question provides that the negligence of a governmental employee is not actionable when, as a result of that negligence, an assault or battery is committed by another. Nothing suggests that the one committing the assault or battery need be a government employee, and the entire focus of the subsection is upon the negligent government employee, not on the intentionally acting assailant. Because it is the negligence of the governmental employee upon which any claim of liability must rest, it would make no sense to engraft upon that waiver a limitation based upon the status of the assailant.

We also note that Higgins cites no Utah authority for her position. Nor could she. When we have considered claims that the state's negligence permitted an assault by a person who was not a state employee, we have held uniformly that the state is immune. *See, e.g., Ledfors,* 849 P.2d at 1165–67; *Maddocks v. Salt Lake City Corp.,* 740 P.2d 1337, 1339 (Utah 1987); *Madsen v. State,* 583 P.2d 92, 93 (Utah 1978); *Epting v. State,* 546 P.2d 242, 244 (Utah 1976); *Emery v. State,* 26 Utah 2d 1, 2, 483 P.2d

---

7. We emphasize here that the phrase "should have known" should not be construed to require that a health-care provider take measures not otherwise indicated by the apparent symptoms of the patient. As we noted earlier, we decline to impose any additional duty on the health-care provider that would distort the traditional relationship between the provider and patient and the provider's duty to that patient.

1296, 1297 (1971); *Sheffield v. Turner*, 21 Utah 2d 314, 316–17, 445 P.2d 367, 368–69 (Utah 1968); *see also Kirk v. State*, 784 P.2d 1255, 1256–57 (Utah Ct.App.1989).

█ Accordingly, we follow *Ledfors* and hold that section 63–30–10 bars a suit against a governmental entity for injuries alleged to have been caused by negligence that results in an assault or battery, whether or not the assailant is a government employee. Here, the injuries alleged to flow from the negligence of the governmental defendants all stem from a battery—Trujillo's stabbing of Shaundra. Consequently, section 63–30–10 bars this action. Therefore, although we hold that the trial court erred in basing a grant of summary judgment on the lack of duty, governmental immunity presents an independent ground for affirming the decision below. *See Hill*, 827 P.2d at 246.

We affirm the judgment of the district court.

HALL, C.J., and STEWART and DURHAM, JJ., concur.

HOWE, Associate C.J., concurs in the result.