Laurie MALCOLM, a minor, and her
guardian Lois Fern Malcolm,
Plaintiffs and Appellees,

v.

STATE of Utah; Utah State Department
of Corrections; Adult Probation and Pa-
role; Brant A. Carson; John Does I
through X; and ABC Agencies I through
X, Defendants and Appellants.

No. 910300.

Supreme Court of Utah.

March 24, 1994.

Thomas A. Duffin, Hans M. Scheffler, Salt
Lake City, for plaintiffs.

R. Paul Van Dam, Atty. Gen., Debra J.
Moore, Carol Clawson, Asst. Attys. Gen., Salt
Lake City, for defendants.

HOWE, Justice:

The State of Utah, the Utah Department
of Corrections, and Adult Probation and Pa-
role (the "state defendants") appeal from a
judgment entered on a jury verdict awarding
plaintiff Laurie Malcolm $134,000 in dam-
ages.[1] In reviewing a jury verdict, we "view
the evidence and all reasonable inferences
drawn therefrom in a light most favorable to
the verdict." *State v. Dunn,* 850 P.2d 1201,
1205 (Utah 1993); *State v. Hamilton,* 827
P.2d 232, 233–34 (Utah 1992); *Andreason v.
Aetna Casualty & Sur. Co.,* 848 P.2d 171, 173
(Utah Ct.App.1993). We recite the facts ac-
cordingly.

In August 1986, the Board of Pardons
paroled Brant A. Carson from the Utah State
Prison. He had been paroled in July 1981
from concurrent sentences of zero to five
years for burglary and one to fifteen years
for rape. However, he was incarcerated
again in September 1982 after he pleaded
guilty to robbery. In addition to these con-
victions, Carson had a history of sexual mis-
conduct. In 1977, he admitted to police that
he had committed a rape, a sexual molesta-
tion, and an attempted rape. Prior to his
first prison commitment, Carson was re-
ferred to the Utah State Hospital Sex Of-
fender Treatment Program but was not ac-
cepted for treatment. However, he did par-
ticipate in a sex offender treatment program
while incarcerated. Shortly before his parole
in 1986, he was registered as a sex offender

---

1. The jury found that the state defendants were
50% at fault for plaintiff's injuries and awarded
her $3000 in past medical expenses, $15,000 in
future medical expenses, and $250,000 in gener-
al compensatory damages.

with the State Bureau of Criminal Identification.

In May 1986, within ninety days prior to his parole date, Carson was accepted into the prison prerelease program. This permitted him to find and maintain a job outside the prison so long as the employment met certain standard restrictions.[2] The prison assigned to each prerelease inmate a job counselor who provided transportation to job interviews. However, the inmate was responsible for finding potential employers. Once an inmate received a job offer, the counselor "confirm[ed] the details of employment and the suitability of the proposed employment by completing an in person interview with the employer and filing in the inmate's [file] jacket, the employer verification form."

In June 1986, Carson and his job counselor, Richard Decol, drove to an awning factory called Allied Griffin so that Carson could apply for a welder position that had been advertised in a local newspaper. Allied was a family business owned and operated by Fern and Keith Malcolm. The business employed the Malcolms' four daughters, including plaintiff, as well as a daughter-in-law and a granddaughter. Carson told Mr. Malcolm that he was an inmate and that he was a first-time offender in prison for robbery. Mr. Malcolm noticed the state car in the parking lot and asked to speak to Carson's "parole officer." Carson went to the car, told Decol that he had the job, and asked him to come inside. Decol explained to both Mr. and Mrs. Malcolm the standard conditions under which Carson could be employed. Mr. Malcolm informed Decol that Carson claimed to be serving time for robbery. Unaware of Carson's prior rape conviction but with access to his complete history, Decol confirmed this. According to the Malcolms, Decol also stated that Carson was a family man and one-time offender and that they had nothing to worry about. Mr. Malcolm then asked if

there was anything else he should know, and Decol responded "no."

Carson successfully completed the prerelease program while working at Allied Griffin. He was then placed in the intensive supervision program ("ISP"), a strict parole program reserved for repeat offenders with a high risk of recidivism. The ISP screening committee had referred Carson to the Bonneville Sex Offender Program. However, when he was not accepted for treatment, the committee decided not to make participation in the program a condition of his parole. Carson completed the ISP without incident and was placed on regular parole in November 1986. During that month, Allied laid Carson off due to a seasonal decline in business.

Approximately six months later, while still on parole, Carson went to visit a friend who lived near the Malcolm home. He had consumed several beers and had taken "meth-tabs," or speed. Unable to find his friend's residence, he went to the Malcolm home, where he broke in and assaulted, sexually assaulted, raped, and battered sixteen-year-old Laurie Malcolm. Police arrested him several days later, and in April 1988, he pleaded guilty to forcible sexual abuse.

Plaintiff brought this action for damages against the state defendants, three state employees in their personal capacities, and Carson. The state defendants and employees moved for summary judgment on the ground that they owed no duty to plaintiff and they were immune from liability under the Utah Governmental Immunity Act. Utah Code Ann. §§ 63–30–1 to –38. Specifically, they relied on the discretionary-function, misrepresentation, and incarceration exceptions to the general statutory waiver of sovereign immunity for negligence claims. Utah Code Ann. § 63–30–10(1)(a), (f), (j) (current version at Utah Code Ann. § 63–30–10(1), (6), (10)).[3]

2. For example, prerelease inmates were required to arrive at and depart from the job by prison transportation at specified times. They could not drive a vehicle without supervision or have visitors at work, and they could not be employed by a relative. The use of drugs or alcohol was strictly forbidden. While prerelease inmates were to be paid at least minimum wage, pay-

checks were to be forwarded to the Department of Corrections.

3. The 1990 amendment to section 63–30–10 deleted the subsection designation (1) from the beginning of the section and redesignated subsections (1)(a) to (1)(*l*) numerically. The discretionary-function, misrepresentation, and incar-

The court granted the motion as to the state employees but not as to the state defendants. It also ordered that the trial be bifurcated. One jury would decide whether Carson had raped plaintiff, and then, if necessary, a second jury would apportion the liability between the state defendants and Carson for plaintiff's injuries.

The first jury found that Carson had committed assault, battery, aggravated sexual assault, and rape against plaintiff. The state defendants renewed their motion for summary judgment, adding the assault and battery exception in section 63–30–10(2) as a further ground for immunity. The court denied the motion, and the second phase of the trial commenced. After plaintiff had rested and again at the close of all the evidence, the state defendants moved for a directed verdict. The court reserved ruling on both motions. The jury returned a verdict against the state defendants for $134,000 in compensatory damages. The state defendants moved for judgment notwithstanding the verdict and, in the alternative, for a new trial. The court denied both motions, and the state defendants appeal.

"[A]ny negligence action against a governmental entity raises traditional tort questions of duty and breach of duty, as well as independent questions relevant to governmental immunity." *Ledfors v. Emery County Sch. Dist.*, 849 P.2d 1162, 1163 (Utah 1993). If a plaintiff fails to state a "legally valid tort cause of action, we usually have declined to undertake the immunity analysis." *Id.* at 1164. However, for purposes of this opinion, we will assume, without deciding, that a special relation existed both between the state defendants and Carson and between the state defendants and plaintiff. We will also assume that these special relations imposed upon the state defendants a legal duty to control Carson's conduct and to protect plaintiff. *See Rollins v. Petersen*, 813 P.2d

1156, 1159 (Utah 1991) (citing Restatement (Second) of Torts § 315 (1965)). We will further assume, without deciding, that the state defendants breached these legal duties by failing to properly implement the prerelease program and the ISP and by failing to disclose Carson's prior sex offenses. Finally, we will also assume that the breach of the state defendants' legal duties proximately caused plaintiff's injuries.

■ Turning to the immunity analysis, Utah Code Ann. § 63–30–3(1) provides that "all governmental entities are immune from suit for any injury which results from the exercise of a governmental function." Section 63–30–10 waives this immunity for "injury proximately caused by a negligent act or omission of an employee committed within the scope of employment." However, subpart (2) of section 63–30–10 "retains immunity from suit for negligence that results in an 'injury [that] arises out of . . . [an] assault [or] battery.'" *S.H. v. State*, 865 P.2d 1363, 1365 (Utah 1993). In implementing the prerelease program and the ISP, the state defendants performed a governmental function, and as explained, we will assume that plaintiff has stated a negligence cause of action against them. The remaining question is whether plaintiff's claim falls within the assault-and-battery exception to the general waiver of governmental immunity for negligence claims.[4] This is a question of law to be reviewed for correctness. *See Maddocks v. Salt Lake City Corp.*, 740 P.2d 1337, 1340 (Utah 1987).

■ Plaintiff contends that her injuries did not arise out of an assault or battery but were the result of the state defendants' negligent implementation of the prerelease program and the ISP. Such attempts to evade the governmental immunity retained under section 63–30–10 by "recharacterizing the supposed cause of the injury" have been rejected. *S.H. v. State*, 865 P.2d at 1365;

---

ceration exceptions are now respectively codified at Utah Code Ann. § 63–30–10(1), (6), and (10). The assault and battery exception in section 63–30–10, formerly subpart (1)(b), is now codified at Utah Code Ann. § 63–30–10(2). In this opinion, we will use the current numerical designations in referring to subparts of section 63–30–10.

4. Because we hold that plaintiff's injuries arose out of an assault and battery, Utah Code Ann. § 63–30–10(2), we need not decide whether the discretionary-function, misrepresentation, and incarceration exceptions to the waiver of immunity for negligence claims also apply to these facts. Utah Code Ann. § 63–30–10(1), (6), (10).

Ledfors, 849 P.2d at 1166; see Higgins v. Salt Lake County, 855 P.2d 231, 234, 240 (Utah 1993); see also Sheffield v. Turner, 21 Utah 2d 314, 316, 445 P.2d 367, 368 (1968). In deciding whether immunity has been retained under section 63–30–10, we "focus on the conduct or situation out of which the injury arose." Ledfors, 849 P.2d at 1166. If a subpart of section 63–30–10 describes that conduct or situation, then immunity is preserved. This is the case here. Plaintiff's injuries arose out of an assault and battery, conduct specifically described in subpart (2) of section 63–30–10. Therefore, the state defendants are immune from suit.

Plaintiff concedes that governmental immunity is retained for negligence resulting in injuries that arise out of a simple assault or battery. However, she argues that the plain language of section 63–30–10 does not retain immunity for injuries arising out of a rape or aggravated sexual assault. As explained, in applying section 63–30–10, we focus on the *conduct* out of which the injury arose. Aggravated sexual assault and rape are two of the countless ways in which a person may commit assault and battery. In seeking civil damages for these offenses, victims sue for assault and battery, not for aggravated sexual assault and rape. The fact that the criminal code specifically prohibits these particular kinds of assault and battery does not alter the character of the conduct itself. Our decision in Higgins illustrates this principle. In Higgins, a mental patient, who had been periodically under the care of Salt Lake County and the state, stabbed a child three times in the chest. The child's mother brought a civil action against the county and the state for negligent diagnosis, supervision, and treatment of the patient. We held that the defendants were immune from suit under the assault-and-battery exception in Utah Code Ann. § 63–30–10(2). We did so despite the fact that the patient was found "guilty and mentally ill" of attempted criminal homicide, a second degree felony not specifically enumerated in a subpart of section 63–30–10. Higgins, 855 P.2d at 234.

In holding that the state defendants are immune from suit, we are not unmindful of the grievous wrong done to plaintiff, nor do we discount the severity of her resulting physical and emotional injuries. Indeed, on these facts, the immunity from suit imposed by the legislature may seem unconscionably broad. Nevertheless, the "remedy lies with that same legislature." S.H. v. State, 865 P.2d at 1365.

The district court judgment is reversed.

ZIMMERMAN, C.J., DURHAM, J., and ORME, Court of Appeals Judge, concur.

STEWART, Associate C.J., concurs in the result.

ORME, Court of Appeals Judge, sat to fill the vacancy on the court.