**Vernon Peter ORR, Plaintiff,**

v.

**BRIGHAM YOUNG UNIVERSITY,
a Utah non-profit corporation,
Defendant.**

No. 91–C–1170–S.

United States District Court,
D. Utah,
Central Division.

Aug. 5, 1994.

Max D. Wheeler, Richard A. Van Wagoner, Snow Christensen & Martineau, Salt Lake City, UT, for Plaintiff.

Eugene H. Bramhall, Provo, UT, Hal H. Visick, David B. Thomas, Provo, UT, Edwin J. Richards, Edwin J. Richards & Associates, Santa Ana, CA, for Defendant.

## MEMORANDUM DECISION

SAM, District Judge.

### I. *INTRODUCTION*

The court has before it defendant's Motion for Summary Judgment.[1] This case raises issues regarding the duty of care owed by a university to one of its football players. Defendant Vernon Peter Orr ("Orr") attended Brigham Young University ("BYU") from the fall of 1988 until April 1990 and played on the varsity football team for two football seasons. Prior to attending BYU, Orr attended Dixie College in St. George, Utah, and played for two years on the football team. Orr denies having any lower back pain or injury prior to attending BYU.

In August of 1988, Orr felt pain in his back during a practice drill with a blocking sled. After practice, Orr was examined by associate head trainer Marv Robertson ("Robertson"). Robertson concluded that Orr had a probable SI joint (the joint between the spine and the pelvis) immobilization which he began treating with heat, massage, mobilization and electric stimulation. Orr missed the afternoon practice. Orr asserts that, later that evening, Coach Tom Ramage ("Ramage") berated him for having missed practice. The next morning Orr was again given therapy by the trainer and practiced with the team. Prior to practice, Orr discussed his injury and pain with his position coach, Ramage, who told him to see if it would loosen up during practice. Orr's back felt progressive-

---

1. BYU has also filed a Motion in Limine which may be impacted by the court's memorandum decision. The court reserves judgment on the Motion in Limine until such time as this matter is set for trial.

ly better during the course of practice. During the afternoon practice, Ramage inquired about Orr's condition and Orr told him it was getting better. Ramage instructed Orr to keep seeing the trainers. Orr received five or six treatments for his back and then stopped seeing the trainers. Approximately one and one-half months later, Orr experienced another episode of lower back pain during practice. Ramage referred him to the trainers for treatment and the pain resolved itself quickly. Orr was not injured or impaired for any of the games in 1988 and did not play any of them in pain. Orr vaguely remembers having back pain during the remainder of the 1988 season and he had his back massaged with heat and ice.

In 1989, Orr had lower back pain and stiffness which came on gradually during spring practice. Orr sought treatment from a trainer and the pain and stiffness resolved itself within twenty-four to forty-eight hours. Orr again had back pain and stiffness during the fall practice and after the first or second game of the season. Ramage asked Orr "How is it?" and Orr responded "Oh, it's not too bad yet." Ramage directed Orr to see the trainers after practice. Orr did not see the trainers as directed because the pain was not bad and he still felt "pretty much 100%". For the remainder of the 1989 season, Orr had mild episodes of back pain but cannot remember if they were reported to the coaching staff or the medical staff.

In the last game of the 1989 season, Orr complained of back pain at half-time and was examined by two orthopedic specialists. The doctors found no sign of disc or neurological impairment but located the "trigger point" of a muscle spasm. An injection of anesthetic was given at the trigger point to relax the spasm and thus reduce pain. Orr returned to play with the instruction that he was to leave the game if the pain increased or changed. Orr played the remainder of the game. After the game, all players who had been injured were instructed to report to the medical clinic in the athletic training room the next day. Orr did not report.

During practice two weeks later, Orr suffered a back injury. He was referred to the medical staff. Examination revealed reticular pain and he was sent for radiological imaging which showed three herniated discs. Orr was immediately referred to a neurological surgeon, who performed surgical repair of the herniated discs. At the close of BYU's 1991 winter semester, Orr left BYU to play professional football in Finland. Orr did not return to BYU to complete his education.

## II. SUMMARY JUDGMENT STANDARD

■ Under Fed.R.Civ.P. 56, summary judgment is proper only when the pleadings, affidavits, depositions or admissions establish there is no genuine issue regarding any material fact and the moving party is entitled to judgment as a matter of law. The burden of establishing the nonexistence of a genuine issue of material fact is on the moving party.[2] E.g., Celotex Corp. v. Catrett, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). This burden has two distinct components: an initial burden of production on the moving party, which burden when satisfied shifts to the nonmoving party, and an ultimate burden of persuasion, which always remains on the moving party. See 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2727 (2d ed.1983).

When summary judgment is sought, the movant bears the initial responsibility of informing the court of the basis for his motion and identifying those portions of the record and affidavits, if any, he believes demonstrate the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323, 106 S.Ct. at 2552–2553. In a case where a party moves for summary judgment on an issue on which he would not bear the burden of persuasion at trial, his initial burden of production may be satisfied by showing the court there is an absence of evidence in the record to support the nonmovant's case.[3] Id., 477

2. Whether a fact is material is determined by looking to relevant substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

3. In his dissent in Celotex, Justice Brennan discussed the mechanics for discharging the initial burden of production when the moving party seeks summary judgment on the ground the non-

U.S. at 323, 106 S.Ct. at 2552–2553. "[T]here can be no issue as to any material fact . . . [when] a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.*

Once the moving party has met this initial burden of production, the burden shifts to the nonmoving party to designate "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553.

> If the defendant in a run-of-the-mill civil case moves for summary judgment . . . based on the lack of proof of a material fact, the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other, but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented. The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff. The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict. . . .

*Liberty Lobby*, 477 U.S. at 252, 106 S.Ct. at 2512. The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* If the nonmoving party cannot muster sufficient evidence to make out a triable issue of fact on his claim, a trial would be useless and the moving party is entitled to summary judgment as a matter of law. *Id.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202.

> moving party—who will bear the burden of persuasion at trial—has no evidence:
>> Plainly, a conclusory assertion that the nonmoving party has no evidence is insufficient Such a 'burden' of production is no burden at all and would simply permit summary judgment procedure to be converted into a tool for harassment. Rather, as the Court confirms, a party who moves for summary judgment on the ground that the nonmoving party has no evidence must affirmatively show the absence of evidence in the record. This may require the moving party to depose the nonmoving

### III. DISCUSSION

In his amended complaint, Orr alleges two claims for relief—the first claim is based on BYU's alleged negligence, and the second claim is for punitive damages.

#### 1. Negligence

Orr asserts that BYU negligently breached its duty of care owed to him in one or more of the following respects:

a. engendering a win-at-all-cost mentality;

b. excessively pressuring players to perform;

c. using psychological pressure to increase performance at the sacrifice of his health;

d. creating disincentives to report injuries or seek medical attention;

e. conditioning payment for medical services on an athletic trainer's determination of medical need;

f. employing unqualified persons to diagnose and treat football related injuries;

g. allowing unqualified personnel to evaluate his medical fitness to play football;

h. misdiagnosing his injuries;

i. failure of the trainers to refer him to a team physician for diagnosis and treatment;

j. failing to hire a full-time team physician responsible for diagnoses and treatment in lieu of unqualified trainers;

k. approving and encouraging him to play after being injured;

> party's witnesses or to establish the inadequacy of documentary. evidence. If there is literally no evidence in the record, the moving party may demonstrate this by reviewing for the court the admissions, interrogatories and other exchanges between the parties that are in the record. Either way. however, the moving party must affirmatively demonstrate that there is no evidence in the record to support a judgment for the nonmoving party.
> 477 U.S. at 323, 106 S.Ct. at 2552–2553 (citations omitted).

l. using pain killing injections to enable him to continue to play without completely diagnosing his injury;

m. placing greater emphasis on winning football games than on his physical and mental health;

n. losing interest in him and failing to assist him further in his education;

o. failing to act to preserve his health, and to treat his injuries in his long term personal best interest, to see that his educational needs were met; and,

p. engaging in the unauthorized practice of medicine.

BYU argues that "[e]xcept for those duties relating to claims of medical negligence or violations of medical standards of care, the long list of alleged duties owed to Orr and breached by BYU are ones that have never been identified or recognized as duties owed as a matter of law." BYU's Memorandum in Support, p. 11.

*Special Relationship—Restatement (Second) of Torts § 314A*

Much of Orr's claim of negligence is based upon the breach of purported duties of care created by the special relationship between a university and its student athletes. Orr incorrectly states that this court has previously concluded that his pleadings stated a claim based on special relationship. *See* Orders dated April 16, 1992 and May 21, 1992. In the context of BYU's motion to dismiss Orr's complaint, the court simply ruled that Orr's claim of negligence based on allegations of the breach of purported duties owed him were sufficient, at that juncture in the litigation, to withstand the motion to dismiss.[4] The existence of many of the duties Orr claims BYU breached are based on the parties' relationship, a factual inquiry. *See Higgins v. Salt Lake County,* 855 P.2d 231 (Utah 1993) (issues of material fact as to whether special relationship existed precluded summary judgment). The court now revisits these issues in the context of a motion for summary judgment under the standard set forth earlier.

The existence of a duty of care owed by the defendant to the plaintiff is an essential element of a negligence claim. *Williams v. Melby,* 699 P.2d 723 (Utah 1985). Absent a duty of care, there can be no recovery. *Higgins v. Salt Lake County,* 855 P.2d 231 (Utah 1993).

> Ordinarily, a party does not have an affirmative duty to care for another.... The law imposes upon one party an affirmative duty to act only when certain special relationships exist between the parties. These relationships generally arise when one assumes responsibility for another's safety or deprives another of his or her normal opportunities for self-protection. Restatement (Second) of Torts § 314A (1964). The essence of a special relationship is dependence by one party upon the other or mutual dependence between the parties. *Id.* at comment (b).
>
> To avoid summary judgment, [Plaintiff] was obligated to prove that she had a special relationship with the University to supervise and protect her and that the duty was breached, causing her injuries.

*Beach v. University of Utah,* 726 P.2d 413, 415–416 (Utah 1986) (footnote omitted). In attempting to extend the legal duties owed to him by BYU, Orr, in essence, urges that BYU, having recruited him to play football, assumed the responsibility for his safety and deprived him of the normal opportunity for self protection.

Federal courts in cases based upon diversity jurisdiction apply the substantive law of the forum state. *Moore v. Subaru of America,* 891 F.2d 1445 (10th Cir.1989). Where the state's highest court has not addressed the precise issue, the federal court must predict how the state court would resolve the issue if it were called upon to do so. *Adams–Arapahoe School Dist. No. 28–J v. GAF Corp.,* 959 F.2d 868 (10th Cir.1992).

The Utah Supreme Court has not been called upon to rule on the precise issue presented here. However, direction is provided by analogous authority found in several Utah

---

4. For purposes of a motion to dismiss "[t]he factual allegations of the complaint must be taken as true and all reasonable inferences from them must be indulged in favor of the complainant." *Mitchell v. King,* 537 F.2d 385, 386 (10th Cir.1976).

Supreme Court cases, although factually distinguishable. For example, the plaintiff in *Beach v. University of Utah*, 726 P.2d 413 (Utah 1986), alleged breach of a duty of care based upon a special relationship between the university and the student, injured while intoxicated on a field trip sponsored by the university and supervised by a university professor. After examining the relationship of a university and its students, the Utah Supreme Court concluded that the relationship was not custodial in nature and that law and society increasingly recognized the modern college student as an adult and not a child in need of custodial care. The analysis of *Beach* concerning the nature of the parties' relationship is helpful in evaluating Orr's relationship with BYU.

> The students whose relationship to the University we are asked to characterize as "custodial" are not juveniles. Beach was twenty years of age at the time of the accident. She may have been denied the right to drink by Utah law, but in virtually all other respects she was entitled to be treated as an adult. She had a constitutional right to vote, ... she was to be chargeable on her contracts, ... and if she had committed a crime, she would be tried and sentenced as an adult.... We do not believe that Beach should be viewed as fragile and in need of protection simply because she had the luxury of attending an institution of higher education.

> Not only are students such as Beach adults, but law and society have increasingly come to recognize their status as such in the past decade or two. Nowhere is this more true than in the relations between students and institutions of higher education....

> .    .    .    .    .

> We also must consider the nature of the institution. Elementary and high schools certainly can be characterized as a mixture of custodial and educational institutions, largely because those who attend them are juveniles. However, colleges and universities are educational institutions, not custodial....

> A realistic assessment of the nature of the relationship between the parties here pre-

cludes our finding that a special relationship existed between the University and Beach or other adult students....

*Beach v. University of Utah*, 726 P.2d 413, 418–419 (Utah 1986).

■ It is also incumbent upon the court to evaluate the parties' relationship from a policy, as well as from a factual, viewpoint. *Higgins v. Salt Lake County*, 855 P.2d 231 (Utah 1993).

> [W]e have taken a policy based approach in determining whether a special relation should be said to exist and consequently whether a duty is owed....

> Determining whether the actor has a duty to prevent another's harm requires careful consideration of the consequences of imposing that duty for the parties and for society.... We are loath to recognize a duty that is realistically incapable of performance or fundamentally at odds with the nature of the parties' relationship.... As we explained in *Beach*:

>> [I]t is meaningless to speak of "special relationships" and "duties" in the abstract. These terms are only labels which the legal system applies to defined situations to indicate that certain rights and obligations flow from them; they are "an expression of the sum total of those considerations of policy which lead the law to say that a particular plaintiff is entitled to protection."

> *Beach*, 726 P.2d at 418 (quoting William Prosser, Law of Torts 333 (3d.1964)).

> In *Beach, Ferree [v. State*, 784 P.2d 149 (Utah 1989)], and *Rollins [v. Petersen*, 813 P.2d 1156 (Utah 1991)], we performed this sort of pragmatic, policy-based analysis in the context of claims that an injured party, as a member of a large undifferentiated group, such as a university student body (*Beach*) or the general public (*Ferree* and *Rollins*), was owed a duty by a defendant to protect the injured party from self-created dangers (*Beach*) or from injuries by third parties under the custody or control of the defendant (*Ferree* and *Rollins*). In each, we concluded that if the broad claim for a special relationship and the consequent duty was accepted, the defen-

dant in question would be unable to perform the duty without either radically changing its character or drastically circumscribing the function it was charged with performing. . . .

.    .    .    .    .

It is important to recognize that in the above-referenced cases, we did not reject the possibility of a duty flowing from these institutions to a specific individual or the narrow classes of individuals who for some reason were distinguishable from the mass. We only rejected the claims for broad categories of special relationships which operatively seem to be indistinguishable from a general negligence theory. . . . As we held in *Rollins*, this analysis produces results that appear to diverge from sections 314, 315, and 319 of the Restatement. . . . However, we think our approach is more realistic than that which would result from a broad reading of the Restatement, especially when one considers the fact that at bottom, the issue is one of negligence—a lack of reasonable care—as opposed to what actions of others it would be nice to be insured against.

*Higgins v. Salt Lake County,* 855 P.2d at 236–237.

■ Arguably, Orr, as a collegiate football player, had both demands and advantages distinct from those of the average college student. However, in the court's view, any distinctions are more of a contractual nature than a custodial nature mandating special duties of care and protection beyond those traditionally recognized under a simple negligence theory of liability. BYU, in exchange for a student's promise to play football, agrees to provide the student with such benefits as special consideration in meeting entrance requirements, financial assistance, training table meals, training equipment, medical services, and academic support. Certainly when training and medical services are provided and then negligently performed, liability could result under existing theories of negligence. However, nothing in the facts supports Orr's contentions that, by playing football for BYU, he became in essence a ward of the university without any vestige of free will or independence.[5] At the time Orr began attending BYU he was twenty-two years old, married with one child. The court finds no facts which suggest that Orr's relationship with BYU was custodial in nature.

Viewing this matter from a policy perspective, as directed by the Utah Supreme Court, the court is of the view that acknowledging many of the duties that Orr urges BYU breached is "fundamentally at odds with the nature of the parties' relationship." *Higgins,* 855 P.2d at 237. As the Utah Supreme Court concluded, "society considers the modern college student an adult, not a child of tender years." *Beach,* 726 P.2d at 419. The court finds nothing different about a student athlete's relationship with a university which would justify the conclusion that a student athlete is a custodial ward of the university while the non-athlete student is an emancipated adult. An athlete's choice to participate in a sport is not coerced. Voluntary association with a collegiate athletic team does not make the student less of "an autonomous adult or the institution more a caretaker." *Beach,* 726 P.2d at 419. n. 5. As noted earlier, the court views any distinctions between a regular student and a student athlete as more contractual in nature than custodial. In short, the court finds no compelling reasons to impose upon colleges and universities additional duties beyond those owed to other students or those presently recognized

5. Orr alleges:

BYU assumed the responsibility for Mr. Orr's safety and deprived him the normal opportunity for self protection. BYU provided medical personnel for him who were not of his choosing, holding them out as competent. BYU offered him no alternative. BYU offered diagnosis and treatment for physical injuries. BYU denied him insurance coverage if he sought independent medical assistance. BYU assumed the responsibility to decide when and whether Mr. Orr should see an independent specialist for injuries. BYU decided whether, when and under what circumstances Mr. Orr physically was able to play football. BYU decided whether continued participation in football posed a risk of harm. BYU not only sought and obtained but demanded Mr. Orr's trust and dependence, depriving Mr. Orr of his "normal opportunities for self protection." The "essence" of the relationship between Mr. Orr and BYU was dependence.

Orr's Memorandum in Opposition to BYU's Motion for Summary Judgment, pp. 30–31.

and available to collegiate athletes under acknowledged legal theories.

Based upon the analysis of the Utah Supreme Court in the analogous case of *Beach v. University of Utah,* the absence of facts supporting a custodial relationship, as well as for sound policy reasons, the court concludes that the supreme court of Utah would reject Orr's claim that duties are owed to him on the basis of a special relationship with the university by virtue of his football player status.

*Restatement (Second) of Torts §§ 321, 323*

Orr also urges imposition of duties on BYU based upon section 321 of the Restatement (Second) of Torts. Apparently Orr contends that BYU's conduct created a situation in which playing him would cause him harm, thus imposing on BYU a duty to protect. Orr asserts that "[w]hether BYU's original conduct was tortious or innocent, it resulted in a situation in which playing Mr. Orr would cause him greater physical harm, thereby imposing on BYU a duty to protect." Orr's Memorandum in Opposition to BYU's Motion for Summary Judgment, p. 32. Section 321 states:

(1) If the actor does an act, and subsequently realizes or should realize that it has created an unreasonable risk of causing physical harm to another, he is under a duty to exercise reasonable care to prevent the risk from taking effect.

(2) The rule stated in Subsection (1) applies even though at the time of the act the actor has no reason to believe that it will involve such a risk.

Restatement (Second) of Torts § 321 (1965). BYU urges that Orr misapplies the duty created under section 321.[6]

Orr also relies on section 323 of the Restatement (Second) of Torts to argue that BYU breached duties owed to him when it negligently performed services it undertook to render to him. Section 323 provides that, if services are rendered, they must be performed with reasonable care. Orr states that section 323 "applies to BYU's providing medical services and making decisions concerning the propriety of his continuing to practice and play football." Plaintiff's Memorandum in Opposition to BYU's Motion for Summary Judgment, p. 33.

"BYU has conceded from the outset of this case that it had a duty to conform to the standard of reasonable care in providing services to its athletes." BYU's Reply Memorandum in Support of Summary Judgment, p. 3. In the court's view, regardless of whether Orr relies on section 321 or section 323, Orr simply asserts claims of medical negligence or violations of medical standards of care. The court finds no factual support to impose additional duties upon BYU based on section 321 or section 323.

*Practicing medicine without a license*

■ Orr also alleges that BYU negligently breached its duty of care to him because BYU's trainers were practicing medicine without a license, in violation of Utah law. BYU denies that its trainers made any diagnoses as contemplated by the statute and asserts that Robertson, who is a licensed physical therapist, is among those described in the statute as licensed to perform a diagnosis.

---

6. Examples of the types of conditions that are governed by § 321 are provided in Comment (a) to that section, and describe situations where:

1. A is playing golf. He sees no one on or near a putting green and drives to it. While the ball is in the air, B, another player, suddenly appears from a bunker directly in the line of A's drive. He is under a duty to shout a warning to B.

2. A, reasonably believing his automobile to be in good order, lends it to B to use on the following day. The same night, A's chauffeur tells him that the steering gear is in dangerously bad condition. A could readily telephone B and warn him of the defective steering gear but neglects to do so. B drives the car the following day, the steering gear breaks and the car gets out of control, causing a collision with the car of C in which B and C are hurt. A is subject to liability to B and C.

3. A, carefully driving his truck, skids on an icy road and his truck comes to rest in a position across the highway where he is unable to move it. A fails to take any steps to warn approaching vehicles of the blocked highway. B, driving his automobile with reasonable care, does not see the truck, skids on the ice and collides with it, and is injured. A is subject to liability to B.

Restatement (Second) of Torts, § 321, Cmt. (a), illus. 1–3 (1965).

The court agrees with BYU's position that Orr has no separate civil claim for negligence based on the unauthorized practice of medicine.

> Civil liability does not depend necessarily on lack of statutory licensing qualifications, but rather upon failure to exercise that degree of care and skill considered proper by correct and accepted standards of the profession involved, or stated otherwise, failure to use that care exercised by skilled professional [people] doing like work in the vicinity.

*Forrest v. Eason,* 123 Utah 610, 261 P.2d 178, 179 (1953). See also *Thompson v. Ford Motor Company,* 16 Utah 2d 30, 395 P.2d 62, 65 (1964) ("... even though the violation of a statute may have occurred, if the circumstances are such that the conduct could nevertheless reasonably be regarded as within the standard of due care, [defendant] is entitled to have a jury determine the issue of his negligence upon the basis of that standard...."). However, practicing medicine without a license may be evidence of negligence, subject to a showing that the conduct complied with the appropriate standard of care. *Hall v. Warren,* 632 P.2d 848 (Utah 1981) (citing *Thompson v. Ford Motor Co.*.).

### Medical negligence

■ Negligence actions ordinarily present questions of fact to be resolved by the finder of fact, and summary judgment should be granted with great caution. *Apache Tank Lines, Inc. v. Cheney,* 706 P.2d 614 (Utah 1985); *Williams v. Melby,* 699 P.2d 723 (Utah 1985). The court finds that disputed issues of fact exist as to Orr's claims based upon BYU's alleged breach of its duty of care to Orr in diagnosing and treating his medical injuries.

Accordingly, BYU's motion for summary judgment as to Orr's claim of negligence based on alleged violations of medical standards of care is DENIED. BYU's motion for summary judgment as to Orr's claim of negligence based upon the list of other duties, except those based on alleged violations of medical standards of care, allegedly owed to Orr and breached by BYU is GRANTED.

### Special Damages

■ Although Orr apparently played professional football in Finland, he asserts that BYU's negligence cost him a promising career in professional football. BYU urges that Orr's claim for damages for the loss of a professional football career should be dismissed because Orr's own expert refutes the possibility that he might have had a professional career. The court agrees. Dr. Momberger, Orr's expert, opines that BYU failed to correctly recognize that Orr has discogenic back disease, a progressive degeneration of the discs in the back brought on by repeated trauma to the discs. Dr. Momberger states that only by quitting football could Orr have prevented the back injury which prevented him from attempting a professional career. In short, regardless of what BYU did or did not do, a jury could not reasonably conclude that Orr could have had a professional football career, even if he had the necessary skills. The court disagrees with Orr's assertion that he is entitled to present the issue of damages from loss of a professional football career to a jury based on the "loss of chance" theory of causation. In urging that position, Orr relies on *George v. LDS Hosp.,* 797 P.2d 1117 (Utah App.1990), *cert. denied,* 836 P.2d 1383 (Utah 1991), where it was held that a jury could have concluded that the failure of hospital nurses to notify doctors of the change in a patient's condition, thus preventing diagnosis and treatment, was a proximate cause of her worsened condition and resulting death. Assuming without deciding that Utah recognizes the "loss of chance" theory of causation and that it extends to cases other than for wrongful death, the court finds it is inapplicable in this case. Even if Orr's condition had been diagnosed earlier, the testimony of Orr's expert is that only by quitting football could Orr have avoided the injury. If Orr quit football, he could not have had a professional career. Thus, there can be no causal connection between BYU's alleged negligence and Orr's claimed damages for loss of a professional football career.

### 2. *Punitive Damages*

■ Orr's second claim for relief seeks to recover punitive damages based upon

BYU's willful and malicious conduct and knowing and reckless indifference and disregard of his rights, life, health and safety. Punitive damages are awarded in limited situations.

> Except as otherwise provided by statute, punitive damages may be awarded only if compensatory or general damages are awarded and it is established by clear and convincing evidence that the acts or omissions of the tortfeasor are the result of wilful and malicious or intentionally fraudulent conduct, or conduct that manifests a knowing and reckless indifference toward, and disregard of, the rights of others.

Utah Code Ann. § 78–18–1(a) (1992). Notice or knowledge of a dangerous condition and failure to act absent more, do not support a claim for punitive damages.

> The Utah Supreme Court identified three elements of the type of conduct that will support an award of punitive damages against a defendant in a negligence action who acts "maliciously or in reckless disregard for the rights of others." Although actual intent to cause injury is not necessary,
>
> > the defendant must either know or should know "that such conduct would ■ in a high degree of probability, result in substantial harm to another," . . . and ■ the conduct must be "highly unreasonable conduct, or an extreme departure from ordinary care, [3] in a situation where a high degree of danger is apparent."

*Gleave v. Denver and Rio Grande Western R.R.*, 749 P.2d 660, 670 (Utah App.) (quoting *Behrens v. Raleigh Hills Hosp. Inc.*, 675 P.2d 1179, 1186–1187 (Utah 1983)), *cert. denied*, 765 P.2d 1278 (1988). The court concludes that there is no evidence which supports Orr's claim for punitive damages. The evidence that Orr marshals regarding alleged defects in BYU's training services largely predates Orr's attendance at BYU. Accordingly, BYU's motion for summary judgment is granted as to Orr's second claim for relief for punitive damages and the same is DISMISSED.

## IV. CONCLUSION

Except for his claim of negligence based on violations of medical standards of care, Orr's first claim for relief is DISMISSED. Orr's second claim for relief for punitive damages is DISMISSED. Orr's claim for special damages for loss of a professional football career is DISMISSED.

IT IS SO ORDERED.