IN THE UTAH COURT OF APPEALS

----ooOoo----

| | | |
|---|---|---|
| Shawnna Rae Cope, | ) | OPINION |
| | ) | |
| Plaintiff and Appellant, | ) | Case No. 20110147-CA |
| | ) | |
| v. | ) | F I L E D |
| | ) | (November 8, 2012) |
| Utah Valley State College, | ) | |
| | ) | 2012 UT App 319 |
| Defendant and Appellee. | ) | |

-----

Fourth District, Provo Department, 060402485
The Honorable Samuel D. McVey

Attorneys:     Terry M. Plant and Stewart B. Harman, Salt Lake City, for Appellant
               Mark L. Shurtleff, J. Clifford Petersen, and Sandra L. Steinvoort, Salt
               Lake City, for Appellee

-----

Before Judges Davis, Voros, and Christiansen.

VOROS, Judge:

¶1      Shawnna Rae Cope appeals the trial court's grant of summary judgment in favor
of Utah Valley State College (UVSC).[1] We affirm in part and reverse in part and remand
for further proceedings.

---

1. UVSC is now known as Utah Valley University. However, we refer to it by its name
at the time of the incident.

## BACKGROUND

¶2    In 2005, Cope was a member of the UVSC Ballroom Dance Tour Team. On September 21, 2005, Cope was injured when she fell while practicing a lift with another team member (Partner). Cope's instructor (Instructor) was supervising the team's rehearsal at the time of the injury. Before the injury occurred, Instructor stopped the rehearsal to have some couples demonstrate the lift and Instructor then worked with each couple individually on the lift. Instructor realized that Cope and Partner were doing the lift incorrectly. Partner was supposed to lift Cope from his right side over his left shoulder but had been lifting her over his right shoulder. Partner told Instructor, "I've never been able to get this lift well." Executing the lift over the left shoulder was more difficult than executing it over the right shoulder because it required greater strength and momentum to get Cope from Partner's right side across his body and over his left shoulder. Instructor warned Cope and Partner, "'[E]ither you guys do this or we are going to cut [the lift from the routine].'" Cope testified in her deposition that she considered the lift "the coolest lift [they] had been doing" in the routine. When Cope and Partner attempted the lift over the left shoulder, Partner lost his footing and Cope fell, hitting her head on Partner's knee and suffering injury.

¶3    In her deposition, Cope testified that she had never danced with Partner before the day of her injury. However, UVSC provided the trial court with a video taken sometime during the week preceding Cope's injury in which she and Partner were recorded practicing the lift together three times, always over the incorrect shoulder.

¶4    According to Cope's expert, executing the lift over the left shoulder when Cope and Partner had been practicing it over the right shoulder was at least as difficult and dangerous, if not more so, than attempting an entirely new lift.[2] She explained that it was the standard in the industry for dancers to use spotters when learning new lifts. She also opined that Instructor should have used spotters on the lift to decrease the risk of injury until the students indicated that they were comfortable with the lift and Instructor determined that they were competent at performing it. Instructor believed

---

2.  The expert explained that learning a lift that is similar to one previously learned is often more difficult than a completely different lift because of the muscle memory associated with the similar lift.

that because Cope and Partner were capable of performing the lift over the right shoulder, no spotters were needed when they practiced the lift over the left shoulder.

¶5    Cope filed a complaint against UVSC on August 14, 2006. Following discovery, UVSC filed a motion for summary judgment on July 29, 2010, arguing that the alleged facts were insufficient to establish that it had a special relationship with Cope that gave rise to a duty of care. The trial court denied the motion. UVSC renewed its motion on December 20, 2010, based on the video evidence showing that Cope and Partner had practiced the lift together, albeit incorrectly, on at least one occasion prior to the date of Cope's injury. In light of this evidence, the trial court revised its earlier decision. It determined that Cope, aware of the couple's prior difficulty in performing the lift, nevertheless accepted the risk of continuing to attempt it rather than have the "'coolest' part of the routine" cut. The trial court concluded that because Instructor gave Cope the option of either learning the lift correctly or having it cut from the routine, Cope could have elected not to do the difficult lift without further consequence and thereby avoided her injury. Accordingly, the trial court concluded that no special relationship arose and that Instructor thus owed Cope no duty of care.

ISSUES AND STANDARDS OF REVIEW

¶6    Cope first contends that the trial court abused its discretion by reconsidering its original denial of UVSC's motion for summary judgment. "A trial court's decision to grant or deny a motion to reconsider summary judgment is within the discretion of the trial court, and we will not disturb its ruling absent an abuse of discretion." *Timm v. Dewsnup*, 921 P.2d 1381, 1386 (Utah 1996) (emphasis omitted).

¶7    Cope also contends that the trial court erred in granting UVSC's motion for summary judgment because a special relationship existed between Cope and Instructor. Summary judgment is appropriate when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Utah R. Civ. P. 56(c). "We review a trial court's order granting summary judgment for correctness," viewing "all facts and inferences in the light most favorable to the nonmoving party." *Mountain West Surgical Ctr., LLC v. Hospital Corp. of Utah*, 2007 UT 92, ¶ 10, 173 P.3d 1276.

20110147-CA                                    3

ANALYSIS

I. Reconsideration of Motion for Summary Judgment

¶8     Cope contends that the trial court erred by reconsidering its original denial of UVSC's motion for summary judgment. Cope's argument relies on rule 60(b) of the Utah Rules of Civil Procedure. That rule permits a trial court to "relieve a party . . . from a final judgment" based on "newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b)." *See* Utah R. Civ. P. 60(b), (b)(2). Cope reasons that the video of Cope and Partner rehearsing in the week prior to the accident, the discovery of which formed the basis for UVSC's motion to reconsider, was not evidence that "by due diligence could not have been discovered," *id.*, prior to the original motion for summary judgment and that the trial court therefore abused its discretion by reconsidering its earlier ruling.

¶9     However, the relevant rule here is not rule 60(b). Rule 60(b) governs the reconsideration of final orders, and the trial court's denial of UVSC's motion for summary judgment was not a final order. The relevant rule is rule 54(b). "Rule 54(b) of the Utah Rules of Civil Procedure . . . allows a court to change its position with respect to any order or decision before a final judgment has been rendered in the case." *Trembly v. Mrs. Fields Cookies*, 884 P.2d 1306, 1310 n.2 (Utah Ct. App. 1994). Rule 54(b) states, "Any order . . . that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties . . . is subject to revision at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties." Utah R. Civ. P. 54(b). While UVSC did present its motion to reconsider as a rule 60(b) motion based on newly discovered evidence, "the substance, not caption, of a motion is dispositive in determining the character of the motion," *see Trembly*, 884 P.2d at 1310 n.2. UVSC's motion was, in substance, simply a rule 54(b) motion to reconsider a non-final order, and thus the trial court had the prerogative to reconsider and revise its prior ruling on the motion for summary judgment. Accordingly, we affirm the trial court on this point.

## II. Special Relationship

¶10    We next consider whether the trial court erred in determining that UVSC owed no duty of care to Cope on the ground that no special relationship existed between Cope and Instructor. "The issue of whether a duty exists is entirely a question of law to be determined by the court." *Ferree v. State*, 784 P.2d 149, 151 (Utah 1989).

¶11    "Duty must be determined as a matter of law and on a categorical basis for a given class of tort claims." *B.R. ex rel. Jeffs v. West*, 2012 UT 11, ¶ 23, 275 P.3d 228. Duty determinations should be expressed in "relatively clear, categorical, bright-line rules of law applicable to a general class of cases." *Id.* (citation and internal quotation marks omitted). For example, *Jeffs* considered "the existence of a duty on the part of healthcare providers to exercise reasonable care in prescribing medications that pose a risk of injury to third parties." *Id.* ¶ 22. The Utah Supreme Court held that "the duty question does not turn on the specific combination of pharmaceuticals that [the nurse practitioner] prescribed or the particular injury that it allegedly caused. Rather, the duty analysis considers healthcare providers as a class, negligent prescription of medication in general, and the full range of injuries that could result in this class of cases." *Id.* ¶ 23. "Thus," the court concluded, the nurse practitioner "would owe no duty to appellants only if there were no duty for the whole class of healthcare providers in these general circumstances." *Id.* The court expressed no opinion on whether the nurse practitioner breached her duty of care, or whether any such breach proximately caused the plaintiffs' damages.

¶12    When governmental actors are involved, special considerations apply to a duty analysis. "As a matter of public policy, we do not expose governmental actors to tort liability for all mishaps that may befall the public in the course of conducting their duties." *Webb v. University of Utah*, 2005 UT 80, ¶ 11, 125 P.3d 906. The public duty doctrine limits a governmental actor's duty to situations where a special relationship exists between the government and specific individuals:

> The public duty doctrine provides that although a government entity owes a general duty to all members of the public, that duty does not impose a specific duty of due care on the government with respect to individuals who may be harmed by governmental action or inaction, unless there is

some specific connection between the government agency
and the individuals that makes it reasonable to impose a
duty.

*Day v. State ex rel. Utah Dep't of Pub. Safety*, 1999 UT 46, ¶ 12, 980 P.2d 1171 (citations omitted). Thus, a government actor owes no specific duty of care to the undifferentiated general public, but only to those persons "who stand so far apart from the general public that we can describe them as having a special relationship to the governmental actor." *Webb*, 2005 UT 80, ¶ 11; *see also Higgins v. Salt Lake County*, 855 P.2d 231, 236–39 (Utah 1993). A number of circumstances may indicate that an individual or distinct group stands sufficiently apart from the general public to create a special relationship, including "governmental actions that reasonably induce detrimental reliance by a member of the public" or a distinct group. *See Day*, 1999 UT 46, ¶ 13 (identifying "[a]t least four circumstances [that] may give rise to a special relationship between the government and specific individuals"); *Higgins*, 855 P.2d at 238–40 (recognizing that special relationships may extend to members of a distinct group).

¶13    Under *Jeffs*, the scope of a special relationship is determined on a categorical level, applicable to a general class of cases. *See* 2012 UT 11, ¶ 23. But "whether a special relationship exists depends upon a careful evaluation of the facts." *Wilson v. Valley Mental Health*, 969 P.2d 416, 419 (Utah 1998). The facts determine whether a particular case falls into a general class of cases where a special relationship exists. *See id.* at 418–20 (identifying a general class of cases where a special relationship exists and discussing the facts to determine whether the case falls into that category); *Higgins*, 855 P.2d at 237–39 (same); *Rollins v. Petersen*, 813 P.2d 1156, 1162 (Utah 1991) (same); *Ferree*, 784 P.2d at 151–52 (same); *Beach v. University of Utah*, 726 P.2d 413, 415–16 (Utah 1986) (same); *Jenkins v. Jordan Valley Water Conservancy Dist.*, 2012 UT App 204, ¶¶ 29–32, 283 P.3d 1009 (same). *But see Cruz v. Middlekauff Lincoln–Mercury, Inc.*, 909 P.2d 1252, 1255–56 (Utah 1996) (suggesting that the duty analysis may turn on consideration of "special circumstances" unique to the facts of each case). Although disputed facts relevant to the special relationship inquiry should be resolved by the factfinder, *see Normandeau v. Hanson Equip., Inc.*, 2009 UT 44, ¶ 21, 215 P.3d 152, whether the facts of a particular case place that case within a special relationship category is a matter of law for the court to decide, *see Ferree*, 784 P.2d at 151.

¶14    University personnel do not generally have a special relationship with students. *Webb*, 2005 UT 80, ¶ 19 (citing *Freeman v. Busch*, 349 F.3d 582, 587 (8th Cir. 2003)). However, in *Webb*, our supreme court implicitly recognized a category of cases where a special relationship arises in the university setting. The possibility that a special relationship can be created follows from the fact that "a college student will inevitably relinquish a measure of behavioral autonomy to an instructor out of deference to her superior knowledge, skill, and experience." *Id.* ¶ 24. The court observed that students—even college students—"want to please their instructors. They want to succeed in their studies. They believe that the instructors have command of the subject matter and the environment in which it is taught." *Id.* ¶ 26. These factors may cause a student to abandon her own "internal signals of peril" and to rely detrimentally on her instructor. *Id.* ¶¶ 26–27; *see also Beach*, 726 P.2d at 415–16 ("The essence of a special relationship is dependence by one party upon the other or mutual dependence between the parties.").

¶15    The difficult question "is to determine how much loss of autonomy a student must sustain and how much peril must be present to establish a special relationship." *Webb*, 2005 UT 80, ¶ 25. *Webb* itself answers this question. There, an earth sciences student participated in a field trip to a condominium project to examine fault lines. The course instructor directed the students to walk on icy and snowy sidewalks through the condominium project. One student slipped and pulled Webb down. The fall injured Webb. *See id.* ¶ 2.

¶16    Our supreme court held that the instructor's directive to walk on the icy sidewalk did not create a special relationship. *See id.* ¶ 27. "A directive received in connection with a college course assignment is an act that would engage the attention of the prudent student." *Id.* ¶ 26. Nevertheless, the directive in *Webb* "did not relate directly to the academic enterprise of the class," but bore only a "tangential relationship to the field trip's academic mission." *Id.* ¶ 27. Thus, the court concluded, the instructor did not "exert the control which might be present in an academic setting to create a special relationship." *Id.* In other words, while the injured student might have relied on the course instructor's expertise in inspecting geologic features, he had no reason to rely on the course instructor's judgment with respect to navigating icy sidewalks. Thus, while *Webb* involved a directive given by a teacher to a student, no special relationship was created, because the directive was not given within the scope of the academic enterprise.

¶17    From this analysis we may extrapolate a general rule: a special relationship is created when (1) a directive is given to a student (2) by a teacher or coach (3) within the scope of the academic enterprise. *See Webb v. University of Utah*, 2005 UT 80, ¶¶ 23–27, 125 P.3d 906.[3] In contrast to *Webb*, the present case involves a directive given by an instructor to a student within the scope of the academic enterprise. Instructor told Cope and Partner, "'[E]ither you guys do this or we are going to cut [the lift from the routine.]'" Thus, like the students on the icy sidewalk in *Webb*, Cope and Partner "were directed" to do the lift. *See id.* ¶ 2. Of course, Cope was not compelled to proceed without spotters; she could have refused, attempted to negotiate for spotters, quit the dance team, or withdrawn from the university. But *Webb* does not require compulsion, merely a directive likely to evoke a reasonable student's "deference to [her teacher's] superior knowledge, skill, and experience." *Id.* ¶ 24. Instructor's statement was such a directive.

¶18    Moreover, unlike the directive in *Webb*, here the directive was given within the scope of the academic enterprise. Cope fell during a rehearsal of the UVSC Ballroom Dance Tour Team. In that context a student does have reason to rely on the dance-related directives of her instructor. Unlike the plaintiff in *Webb*, a student in this circumstance could be expected to "relinquish a measure of behavioral autonomy to [her] instructor out of deference to [his] superior knowledge, skill, and experience." *See id.* ¶ 24. She would reasonably believe that her instructor has "command of the subject matter and the environment in which it is taught." *See id.* ¶ 26. She would "understand that [her] academic success, measured . . . by the degree of knowledge [or skill] acquired . . . , turned on whether [she] abandoned all internal signals of peril to take a particular potentially hazardous [action]." *See id.* ¶ 27. Thus, unlike in *Webb*, Instructor's directives to Cope did "relate directly to the academic enterprise of the class," and bore a direct, not tangential, relationship to the dance program's "academic mission." *See id.* It was "a directive received in connection with a college course assignment that would engage the attention of the prudent student" and thus was a "logical candidate" to

---

3. As the dissent notes, *Webb* engaged in an extensive analysis of the balance between the risk involved in a situation and the control exerted by a teacher. *See Webb v. University of Utah*, 2005 UT 80, ¶¶ 23–27, 125 P.3d 906. But we do not believe *Webb* requires courts to apply this same balancing test for every case in which a student asserts a breach of duty by university personnel. The rule arising out of *Webb* is a product of its balancing of the risk and control factors.

induce detrimental reliance. *See id.* ¶ 26. In sum, every indicator of a special relationship absent from *Webb* is present here.[4]

¶19    Indeed, one factor not discussed in *Webb* is also present here. In *Webb*, the directive was a general one; the instructor directed "Mr. Webb and other students" to walk on icy and snowy sidewalks. *Id.* ¶ 2. Here the directive was specific. Instructor "stopped the rehearsal [and] went to each couple to see where the timing issues were." When he reached Cope and Partner, he instructed them, by name, how to achieve the lift, and did so in terms clearly implying that the lift was safely achievable with a bit more effort: "[Cope], you just need to kick. [Partner], you need to push more or lift more." In this circumstance, it would be a rare student who refused to rely on the superior experience and expertise of her instructor.

¶20    It is true, as the dissent notes, that "Instructor told Cope and Partner only that they must practice the lift correctly, not that they must practice it without spotters." *Infra* ¶ 39. And based on this case-specific fact, the trier of fact may well determine that Instructor did not breach the duty of care that he owed Cope in this circumstance. Insofar as whether a duty existed, however, *Webb* makes clear that the distinction between acts and omissions is not dispositive: "a special relationship relating to a governmental actor can result in the imposition of liability for either her acts or her failure to act." *Webb*, 2005 UT 80, ¶ 13. It follows that, here, Cope "stand[s] so far apart from the general public"—and indeed, so far apart from the other students in the class—"that we can describe [her] as having a special relationship to the governmental actor." *See id.* ¶ 11.

---

4.   We do not believe *Webb* requires that a student have "abandoned *all* internal signals of peril." *Webb*, 2005 UT 80, ¶ 27 (emphasis added). Although this phrase appears in *Webb*, other passages in *Webb* suggest the question is one of degree. *See, e.g., id.* ¶ 24 ("The hypothetical possibility that a special relationship can be created between an instructor and a student in a higher education setting flows from the fundamental reality that . . . a college student will inevitably relinquish *a measure of behavioral autonomy* to an instructor . . . ." (emphasis added)); *id.* ¶ 25 ("The harder question is to determine *how much loss of autonomy* a student must sustain and *how much peril* must be present to establish a special relationship." (emphasis added)); *id.* ¶ 27 (rejecting the claim of a special relationship where "[t]he instructor did not . . . exert the control which might be present in an academic setting").

¶21     This conclusion is consonant with Utah case law. For example, in *Beach v. University of Utah*, 726 P.2d 413 (Utah 1986), our supreme court rejected the claim that a university owed a duty of care to supervise a student who fell from a cliff at night during a field trip sponsored by the university. *See id.* at 414. The *Beach* court concluded that the student's "situation was not distinguishable from that of the other students on the trip" and thus the instructor had no duty to "walk [her] to her tent and see that she was down for the night." *Id.* at 416. Here, Cope's situation *was* distinguishable from that of the other students on the UVSC Ballroom Dance Tour Team.

¶22     Similarly, in *Orr v. Brigham Young University*, 960 F. Supp. 1522 (D. Utah 1994), *aff'd without published opinion*, 108 F.3d 1388 (10th Cir. 1997), a Utah federal district court applied Utah law in determining whether a private university owed an injured football player an affirmative duty of care. The court rejected the player's claim of "a special relationship with the university by virtue of his football player status." *Id.* at 1529. Specifically, the court rejected the football player's claim that, "by playing football for BYU, he became in essence a ward of the university without any vestige of free will or independence." *Id.* at 1528.[5] The court relied on the distinction between "'a large undifferentiated group, such as a university student body,'" and "'narrow classes of individuals who for some reason were distinguishable from the mass.'" *Id.* (quoting *Higgins v. Salt Lake County*, 855 P.2d 231, 236–37 (Utah 1993)). Although the court found no special relationship that would create a duty to act, the court acknowledged that "when training . . . services are provided and then negligently performed, liability could result under existing theories of negligence." *Id.*[6] Here, Cope does not claim that by dancing on the UVSC Ballroom Dance Tour Team she became in essence a ward of the university; rather, she alleges that she was injured when training services were being provided in such a way as to create a special relationship. *See Webb v. University of Utah*, 2005 UT 80, ¶¶ 14, 16, 125 P.3d 906 (noting that the commission of an affirmative act by a governmental actor does not create a duty by itself, "but instead provides relevant

---

5. We read the court's opinion as attributing this hyperbole to the plaintiff in the case; it does not state the legal test in Utah.

6. The court did not explain this reference to "existing theories of negligence." *See Orr v. Brigham Young Univ.*, 960 F. Supp. 1522, 1528 (D. Utah 1994).

information about whether a special relationship existed between the governmental actor and the injured party").

¶23    UVSC cites several cases holding that a duty of reasonable care arises only when a coach or instructor increases the risk of harm beyond that inherent in an activity. *See, e.g.*, *Bushnell v. Japanese Am. Religious & Cultural Ctr.*, 50 Cal. Rptr. 2d 671, 673–74 (Cal. Ct. App. 1996) (holding that a judo student could recover only for an instructor's reckless or intentional conduct, noting that duty sounding in negligence extended only to an instructor's actions that increase the risk inherent in the activity); *Crace v. Kent State Univ.*, 2009-Ohio-6898, ¶¶ 13–15, 924 N.E.2d 906 (Ohio Ct. App.) (applying same standard to a university cheerleading instructor). However, the existence of a duty and the appropriate standard of care are two distinct questions. *See Madsen v. Borthick*, 850 P.2d 442, 444 (Utah 1993) ("In establishing the existence of a duty, the same analysis is used for both a negligence and a gross negligence claim. The difference between the two lies in the degree of care to which the defendant is held."). We believe the concerns raised in the cases cited by UVSC are best addressed by adopting an ordinary standard of reasonable care. *See Kahn v. East Side Union High Sch. Dist.*, 75 P.3d 30, 51–52 (Cal. 2003) (Kennard, J., concurring and dissenting) (stating that the risk of harm inherent in active sports could be accounted for by holding high school coaches to a standard of ordinary care).

¶24    A duty of reasonable care generally encompasses a duty not to create an unreasonable risk of harm. *See Reighard v. Yates*, 2012 UT 45, ¶¶ 29–31, 285 P.3d 1168; *B.R. ex rel. Jeffs v. West*, 2012 UT 11, ¶ 21 & n.11, 275 P.3d 228. What may be reasonable in one setting may not be reasonable in another. Ordinarily participants cannot reasonably expect instructors or coaches to insulate them from risks inherent in an activity in which they voluntarily engage. *See, e.g.*, *Kahn*, 75 P.3d at 38–43 (majority opinion). But whether, under the circumstances of this case, Instructor created an unreasonable risk of harm, increased the risk inherent in competitive ballroom dancing, or was otherwise unreasonable in his acts and omissions is a question for the trier of fact.

¶25    UVSC also argues that policy considerations weigh against imposing a duty of care on coaches of physically strenuous activities. If a duty of reasonable care is imposed, UVSC argues, instructors will hesitate to challenge participants to excel. *See generally id.* (holding that imposing a general duty of reasonable care would chill

vigorous participation in sporting events). Such policy considerations are appropriate when considering whether a special relationship exists. *See Higgins*, 855 P.2d at 236–37. Courts must consider "the practical impact that finding a special relationship would have," including whether the duty is "realistically incapable of performance or fundamentally at odds with the nature of the parties' relationship." *Id.* at 237; *Beach*, 726 P.2d at 418.

¶26    We do not believe our application of the duty outlined in *Webb* to the facts of this case is either incapable of performance or fundamentally at odds with the instructor–student relationship. Participants in sports or extra-curricular programs look to the instructor for direction as they acquire the skills needed to compete. They trust in the instructor's training, expertise, and appreciation of the risks involved. Participants expect instructors to challenge them to excel, but they also expect those instructors to act reasonably in doing so. Furthermore, the standard of reasonable care mitigates the policy concerns raised by UVSC: it leaves "coaches free to challenge or push their students to advance their skills level as long as they do so without exposing the student athletes to an unreasonable risk of harm." *See Kahn*, 75 P.3d at 52 (Kennard, J., concurring and dissenting).

¶27    We conclude that the undisputed facts in this case establish the existence of a special relationship and thus a duty of reasonable care on the part of Instructor. We caution that the existence of this duty does not resolve questions of breach and proximate cause. Whether the risks involved for these particular dancers in performing this particular lift without spotters would cause a reasonable dance instructor to take particular precautions to protect Cope from a fall is a question of breach. And, if Instructor failed to act reasonably in this regard, whether that failure proximately caused Cope's fall and injuries is a question of causation. *See Jeffs*, 2012 UT 11, ¶ 26. "Both of those questions are case-specific and fact-intensive, and they are not before us on this appeal." *Id.* ¶ 28.

CONCLUSION

¶28    Because the trial court's denial of UVSC's first motion for summary judgment was not a final order, the trial court did not abuse its discretion by reconsidering and revising it. Because the facts, considered in the light most favorable to Cope, establish a

special relationship, the trial court erred in granting UVSC's renewed motion for summary judgment. We therefore affirm in part and reverse in part and remand for further proceedings.

_____

J. Frederic Voros Jr., Judge

-----

¶29    I CONCUR:

_____

Michele M. Christiansen, Judge

-----

DAVIS, Judge (concurring in part and dissenting in part):

¶30    I concur with the majority as to part I but reject both the majority's analysis and its conclusion with respect to part II. I believe that the rule articulated by the majority concerning the existence of a special relationship between university students and their instructors significantly broadens the duty of governmental actors in this setting and is inconsistent with the supreme court's holding in *Webb v. University of Utah*, 2005 UT 80, 125 P.3d 906.

¶31    In *Webb*, the supreme court gave specific guidance as to when a special relationship arises between university students and their instructors: "[A] special relationship may be created 'by governmental actions that reasonably induce detrimental reliance by a member of the public.'" *Id.* ¶ 26 (quoting *Day v. State*, 1999 UT 46, ¶ 13, 980 P.2d 1171); *see also Beach v. University of Utah*, 726 P.2d 413, 415 (Utah 1986) (explaining that special relationships "generally arise when one assumes responsibility for another's safety or deprives another of his or her normal opportunities for self-

protection" (citing Restatement (Second) of Torts § 314A (1964))). Detrimental reliance giving rise to a special relationship between an instructor and a student is induced when (1) the instructor "alter[s] the academic environment" from a "benign academic setting" in such a way that the student is subjected to peril beyond the "identifiable and obvious danger" the student assumed by participating in the particular academic setting and (2) a reasonable "student would understand that [her] academic success, measured either by the degree of knowledge acquired or by the positive impression made on the instructor, turned on whether" she ignored an obvious danger in order to fulfill a directive of the instructor. *See Webb*, 2005 UT 80, ¶¶ 23–27.

¶32    The majority rejects the narrow, fact-dependent rule articulated in *Webb* in favor of a much broader rule recognizing a special relationship whenever a university teacher or coach gives a directive to a student "within the scope of the academic enterprise." *See supra* ¶ 17.[1] It then imposes a duty of reasonable care on instructors giving any such course-related directives, redefining the risk and control analysis articulated in *Webb* by asserting that it pertains to the breach of the instructor's duty rather than to the existence of the duty itself.

---

1.  The majority relies on language from *Webb* emphasizing the relationship between the directive and the academic enterprise of the class, *see Webb v. University of Utah*, 2005 UT 80, ¶ 27, 125 P.3d 906, in support of its assertion that any directive that is "within the scope of the academic enterprise" gives rise to a special relationship. However, the *Webb* court explicitly clarified what it meant by a directive "relat[ing] directly to the academic enterprise of the class," stating,

> By this we mean [whether] it is . . . reasonable to believe that any student would understand that his academic success, measured either by the degree of knowledge acquired or by the positive impression made on the instructor, turned on whether they abandoned all internal signs of peril to [engage in] a potentially hazardous [action] . . . .

*Id.* This clarification indicates that the *Webb* court intended a much narrower rule than that articulated by the majority in this case. Furthermore, it confirms that the existence of a special relationship does turn, at least to some degree, on the risk implicated by the instructor's directive and the control the instructor exercised over the student.

¶33    The majority justifies this broad rule by relying on the supreme court's holding in *B.R. ex rel. Jeffs v. West*, 2012 UT 11, 275 P.3d 228, in which it explained that the existence of a duty must be decided "on a categorical basis for a given class of tort claims," *see id.* ¶ 23. The majority implies that if the existence of a special relationship turns on the specific risks implicated by the instructor's directive, then the rule is not appropriately categorical. As an initial matter, I would observe that it is not our prerogative to reject a rule set down by the supreme court in one of its decisions based on our own contradictory interpretation of language in another of its decisions. *See generally State v. Newland*, 2010 UT App 380, ¶ 10 n.5, 253 P.3d 71 ("[U]nder principles of vertical stare decisis, we are prohibited from departing from the precedent established by our supreme court."). In any case, I believe the majority's approach takes the *Jeffs* rule beyond its intended scope.

¶34    The *Jeffs* court explained that in determining whether one individual has a duty to another, we begin with the general rule that "we all have a duty to exercise care when engaging in affirmative conduct that creates a risk of physical harm to others." 2012 UT 11, ¶ 21. We then examine other factors "in determining whether to carve out an exception to the general rule," including "the foreseeability or likelihood of injury, public policy as to which party can best bear the loss occasioned by the injury, and other general policy considerations." *Id.* (citations and internal quotation marks omitted). These factors must be considered "at a categorical level" so that we can determine duty "as a matter of law and on a categorical basis for a given class of tort claims." *Id.* ¶ 23. Thus, the *Jeffs* court determined that it would be inappropriate to carve out an exception for healthcare providers prescribing drugs that would make "the duty question . . . turn on the specific combination of pharmaceuticals . . . prescribed or the particular injury that it allegedly caused." *Id.* The court explained that so long as there were any circumstances within "[t]he relevant category of cases consist[ing] of healthcare providers negligently prescribing medications to patients who then injure third parties," a duty should be imposed on all healthcare providers within that category. *Id.* ¶¶ 27–28. The fact that the negligent prescription of certain, more innocuous medications "may very well involve little foreseeable risk of injury" was irrelevant to the question of duty and only appropriately considered in the context of the more "case-specific and fact-intensive" issues of breach and proximate cause. *See id.* ¶ 28.

¶35  If we were considering whether to carve out an exception to the general rule imposing "a duty to exercise care when engaging in affirmative conduct that creates a risk of physical harm to others," as the *Jeffs* court was, *see id.* ¶ 21, I might be inclined to agree with the majority that a rule relying on the nature of the risk or degree of control is not sufficiently categorical. However, the question we must resolve in this case is not whether Instructor is subject to an exception—we know that he is because the public duty doctrine categorically immunizes governmental actors, such as Instructor, from liability except in specified narrow circumstances. *See Webb v. University of Utah*, 2005 UT 80, ¶¶ 11, 16, 125 P.3d 906 ("As a matter of public policy, we do not expose governmental actors to tort liability for all mishaps that may befall the public in the course of conducting their duties."). Rather, we must determine whether Instructor removed himself from that exception by "creat[ing] a special relationship, where one did not previously exist, by [his] acts," *id.* ¶ 14.

¶36  Although "duty is a purely legal issue for the court to decide," *Normandeau v. Hanson Equip., Inc.*, 2009 UT 44, ¶ 17, 215 P.3d 152, "factual issues may bear on . . . issue[s] . . . relat[ing] to duty," *id.* ¶ 21. For example, in *Cruz v. Middlekauff Lincoln–Mercury, Inc.*, 909 P.2d 1252 (Utah 1996), the supreme court considered whether a car dealership had a duty to a third party who was injured when someone stole a car from the dealership after the keys were left in the ignition. *See id.* at 1253. The categorical rule regarding duty in that circumstance is that "[o]ne having a lawful right to the possession of property, such as an automobile, although negligent in leaving the keys therein, has no duty to respond in damages caused by a thief who takes it and runs into a third party's vehicle." *Id.* at 1255 (citation and internal quotation marks omitted). But the court explained that where "special circumstances" exist that would have "increase[d] the foreseeability of risk to others" by putting the defendant "on notice that its cars were targeted by thieves," a duty may nevertheless be imposed. *Id.* at 1255–57. Thus, the court determined that the disputed existence of such circumstances was a question of fact bearing on the applicability of an exception to the categorical rule imposing no duty, and that the dispute precluded the court from granting a motion to dismiss. *See id.* at 1257. Similarly, the issue of whether a university instructor's actions give rise to a special relationship is a question of fact bearing upon the legal issue of whether an exception to the public duty doctrine applies.

¶37  In a case such as *Jeffs*, where the categorical rule imposes a duty, it is a simple matter to weigh factual considerations that might ultimately relieve the defendant of

liability as part of the breach or proximate cause analysis. However, in a case such as *Cruz*, and indeed, in the case at hand, where the categorical rule states that a duty *does not* exist, factual considerations, such as the risk and control factors relevant to the existence of a special relationship, that might nevertheless make imposition of liability appropriate must be considered as part of the duty analysis or not at all, since resolution of the duty issue disposes of the claim. By adopting an ordinary standard of reasonable care in any circumstance where a university instructor issues a directive within the scope of the academic enterprise, the majority's approach would have us derive a duty from Instructor's mere failure to observe a standard of care.[2] In my view, Instructor's duty to adhere to such a standard must first be established by determining whether a special relationship arose, an analysis which, under *Webb*, implicates the risk and control factors discussed above, *see supra* ¶ 31.

¶38     Although an analysis of duty in the context of university instructors may, at times, require the factfinder to make determinations relating to the fact-dependent special relationship issue, *see Normandeau*, 2009 UT 44, ¶ 21; *Cruz*, 909 P.2d at 1257, I believe that here, as a matter of law, Cope has failed to allege sufficient facts to give rise to a special relationship.[3] "[A] college instructor who has no special relationship with

---

2. And by doing so, the majority's approach significantly undercuts the protection afforded to state university instructors under the public duty doctrine.

3. My reasoning differs from that of the trial court. *See generally Bailey v. Bayles*, 2002 UT 58, ¶ 10, 52 P.3d 1158 ("It is well settled that an appellate court may affirm the judgment appealed from if it is sustainable on any legal ground or theory apparent on the record, even though such ground or theory differs from that stated by the trial court to be the basis of its ruling or action . . . ." (citation and internal quotation marks omitted)). Unlike the trial court, I do not consider the fact that Cope and Partner had practiced the lift during the week preceding the accident to be relevant to the special relationship analysis because they had never practiced the lift correctly. Viewing the facts in the light most favorable to Cope, it is apparent that the attempt to perform the lift over the left shoulder was both different and more difficult than performing it over the right shoulder. Thus, I agree with Cope that it was risky for her and Partner to have attempted it for the first time without spotters regardless of whether they had practiced it incorrectly during the previous week. Furthermore, I do not agree with the trial court

(continued...)

her class members in a benign academic setting can create a special relationship by altering the academic environment." *Webb*, 2005 UT 80, ¶ 23. In order to determine whether the academic environment has been altered, however, we must consider the nature of the academic environment in its "benign" state. The academic environment of the ballroom dance team in its benign state involved the students performing lifts. As Cope's expert witness pointed out in her deposition, falls are an inherent risk of doing all lifts. Thus, Instructor's directive that Cope and Partner practice the lift over the left shoulder did not itself require Cope to confront any danger beyond the inherent risk she assumed by participating with the dance team. *See generally Orr v. Brigham Young Univ.*, 960 F. Supp. 1522, 1528 (D. Utah 1994) (determining that a student's "[v]oluntary association with a collegiate athletic team" does not itself give rise to a special relationship between the student and the college), *aff'd without published opinion*, 108 F.3d 1388 (10th Cir. 1997). It was the increased danger of not using spotters while re-learning the lift that allegedly gave rise to a special relationship in this case, not the risk involved in the lift itself.

¶39     But there is nothing in the facts to suggest that Instructor's directive included, either explicitly or implicitly, a requirement that Cope and Partner practice without spotters. Instructor told Cope and Partner only that they must practice the lift correctly, not that they must practice it without spotters. And there is nothing to suggest that Instructor would not have permitted the dancers to use spotters had they requested them or even to suggest that Cope did not request spotters because she felt that she lacked the autonomy to make such a request.[4] Thus, it was not necessary for Cope and Partner to ignore internal signs of peril and confront an obvious danger in order to

---

3. (...continued)
that Cope autonomously rejected an "option" to decline to perform the lift and have it cut from the routine because she could have reasonably expected that being the cause of having the "cool" lift cut from the routine would leave a negative impression on Instructor and affect her position on the team.

4. In fact, despite the significant variation in the lift, Partner stated in his deposition, "I didn't think I would need to ask for spotters because I know that any time previous to that I was able to control the lift and to sit her down."

fulfill Instructor's directive; they could have simply asked for spotters.[5] Without evidence that Instructor explicitly directed Cope and Partner that they were required to attempt the corrected lift without spotters, or that Cope's academic success turned on whether she re-learned the lift without spotters, the undisputed facts are insufficient to demonstrate that a special relationship arose between Instructor and Cope.[6] *Cf. Webb,* 2005 UT 80, ¶ 27 (determining that an earth science instructor's directive that students walk on icy sidewalks while examining fault lines "did not relate directly to the academic enterprise of the class" and that it was unreasonable "to believe that any student would understand that his academic success . . . turned on whether they abandoned all internal signals of peril to take a particular potentially hazardous route to view fault lines").

¶40   Because the facts considered in the light most favorable to Cope fail to establish a special relationship between Instructor and Cope, I believe that the trial court correctly granted UVSC's renewed motion for summary judgment. Thus, I would affirm.

_____

James Z. Davis, Judge

---

5.  While Instructor may have been in a better position to determine whether spotters were appropriate under the circumstances, and his failure to provide Cope and Partner with spotters may have been contrary to industry standards for safety, unless and until a special relationship arose, Instructor had no duty to provide spotters, no matter how negligent it may have been for him to fail to do so.

6.  I also find the majority's reliance on the fact that Instructor's directive was specific to Cope and Partner, rather than to the entire class, to be misguided. It is the nature of the directive that makes it relevant, not the number of students to whom it is directed. The fact that Cope and Partner's error made it necessary for them to receive individual instruction does not, in and of itself, give rise to a special relationship between them and Instructor.